Ruth J. BUTTS et al., Plaintiffs-
Appellants,

v.

DALLAS INDEPENDENT SCHOOL DIS-
TRICT and Nolan Estes, Defendants-
Appellees.

No. 29281.

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1971.

Marvin Menaker, W. D. Masterson, Atty., Robert Goodfriend, Dallas, Tex., for plaintiffs-appellants.

Franklin E. Spafford, Warren Whitham, Dallas, Tex., for defendants-appellees.

Before RIVES and SIMPSON, Circuit Judges, and NICHOLS, Judge of the Court of Claims.*

NICHOLS, Judge:

Plaintiffs, minors, brought this action by their next friends in the United States District Court for the Northern District of Texas, and appeal from its final judgment dismissing their complaint. We reverse.

The defendants are the Dallas Independent School District, in whose schools plaintiffs were enrolled, and Dr. Nolan Estes, the Superintendent. The action was said to arise under the Fourteenth Amendment and 42 U.S.C. § 1983, which reads as follows:

\* \* \* \* \* \*

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equi-

* Sitting by designation as a member of this panel.

ty, or other proper proceeding for redress. * * *

The alleged wrong was in defendant's refusal to allow plaintiffs to wear black armbands in school on October 15, 1969, and their anticipated continued refusal on later dates. Plaintiffs sought an injunction, a declaratory judgment, and nominal damages of $1.00. The District Judge conducted a hearing and took testimony on a prayer for a temporary injunction, but by stipulation the parties agreed that the hearing and his opinion should be "disposition on merits."

■ Defendants urge that the School District is immune from suit under § 1983, but this circuit has recently held that such immunity exists only with respect to money damages and not as to equitable relief. Harkless v. Sweeney Independent School District, 427 F.2d 319 (5th Cir. 1970). See also Mayhue v. City of Plantation, Florida, 375 F.2d 447–451 (5th Cir. 1967). We treat the claim for $1.00 damages as waived. No evidence was offered to show pecuniary injury in any amount.

■ Defendants also say that plaintiffs do not belong to the class protected by § 1983 because the alleged wrong was not inflicted because of race. The absence of a racial question has been ignored in many cases under § 1983, e. g., Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Trister v. University of Mississippi, 420 F. 2d 499 (5th Cir. 1969), and is expressly rejected by this circuit in construing the closely related criminal provisions of 18 U.S.C. § 242. Miller v. United States, 404 F. 2d 611, 612 (5th Cir. 1968).

Plaintiffs wish to secure a declaratory judgment condemning part of a regulation of the School Board as unconstitutionally vague and overbroad. Identified as Regulation 5133(1) (a) (10), it reads as follows:

(10) Wearing at school any special garb, haircuts, or unusually distracting insignia designed to distinguish members in an excessive way from other students.

The Regulation as a whole is written to implement a Texas statute which undertakes to drive "social clubs," i.e., fraternities, sororities and secret societies from the public schools. It defines certain acts the Board believes to be prohibited, among others those in the paragraph above quoted. The "members" are obviously members of social clubs. The record here reflects that the plaintiffs wished to wear black armbands to show their opposition to United States involvement in the Vietnam hostilities. An organization based in Washington called the National Moratorium Committee had suggested that they do this, and in a loose way they were its supporters, but there is nothing to show it had members in the ordinary sense, as a social club does. In any event, its purposes were political, not social. A separate section of Regulation 5133, not attacked, deals with participation of students in political organizations. Both sides in this litigation, for different purposes of their own, no doubt, seem to agree that paragraph 10 has something to do with this case. Nevertheless, it is an effort to deal with issues wholly distinct from those involved here, and we think it would be improper for us to make any pronouncement upon it. We are not bound by counsels' interpretation of this document. Pitcairn v. American Refrigerator Transit Co., 101 F.2d 929 (8th Cir.), cert. denied, 308 U.S. 566, 60 S.Ct. 78, 84 L.Ed. 475 (1939).

The underbrush cleared away, the main issue of the case emerges. The Supreme Court held in Tinker v. Des Moines Independent Community School District, supra, 393 U.S. at 505, 89 S.Ct. 733, that wearing black armbands in school to protest the Vietnam involvement was "closely akin to pure speech" protected by the First Amendment and could not be prohibited when it did not cause disruption of school discipline or decorum. The Court refers with apparent approval to companion cases in this court: Burnside v.

Byars, 363 F.2d 744 (5 Cir., 1966); and Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5 Cir., 1966). Both involved prohibition against wearing SNCC buttons, by the school authorities. In *Burnside* there was no disruption and the authorities were enjoined. In *Blackwell* there was (in the form of button-wearing students trying to force buttons on the others) and the complaint was dismissed. The duty of the courts in future cases of the same kind therefore seems clear enough, and the trial judge properly proceeded to examine in detail the alleged disruptions and threats of disruption that were considered by the Dallas School Officials on and just before October 15, 1969. To this we now turn.

The Vietnam moratorium of October 15, 1969, may end up as a footnote to history but it was tremendous in anticipation. The focal event was to be a mass peaceful demonstration of young people, about the White House in Washington, D. C., but the sponsors issued a manifesto to high school children elsewhere, among others, calling on them to boycott their classes that day, or attend them wearing black armbands as symbols of protest. Someone published a local mimeographed flyer to the same effect. These found their way into the hands of the defendants' school authorities, who concluded that October 15 probably would be a day of disruption in their schools. A former pupil of the District, not directly connected with the Committee or its supporters, threatened to bomb one of the defendants' schools. As the day approached, disruptive sit-ins did occur in the schools of a nearby community, not under defendants' jurisdiction. The organizers of this effort failed, however, to influence defendants' pupils.

The morning of October 15, a Dallas police officer called on school officials to advise that his department expected trouble and to offer what help he could. A group of students massed across the street from one of the schools displaying a large banner reading "Try Peace." A

youth of contrary mind snatched this banner and ran away with it. Apparently, however, the schools opened and classes were attended as usual, though perhaps not with full efficiency.

Not all students supported the protest. Besides the one mentioned above, others wore white armbands. None of them testified nor were any manifestos offered, which were attributed to them, and their precise position thus is not in the record, except that they opposed what the black armbands favored. There was also a clique who evidently went further, revering the memory of Adolf Hitler and seeking to establish (or re-establish) white supremacy in this country. One of these soon after October 15, appeared at school wearing a large "swastika" necklace and a like symbol emblazoned on his jacket. He was, of course, speedily removed from the scene.

On learning of the plan to wear black armbands in school, Dr. Estes decided, as he testified, that it was disruptive and contrary to long standing school policy. In support of the long standing of this policy, however, he proffered Regulation 5133, which, as indicated above, fails to show it. The trial court's finding as to the long standing of the policy appears to lack support of substantial evidence. If it makes any difference, it would seem the policy was improvised ad hoc for the occasion. Other "peace symbols" until then had adorned the garments of students without evoking any administration concern. Indication that the policy was new appears also in the fact that the principals of some individual schools were slow in getting the word, with the result that in their schools black armbands were in fact worn for several hours, in one school all day. As the principals and assistant principals learned of the policy, they intercepted wearers of black armbands in the halls and corridors, or called them out of class, requiring them to choose between removing the armbands or going home, being then charged with unexcused absence. The plaintiffs all refused to remove their armbands and

left school for the remainder of the day. Many other students took off their armbands. Dr. Estes intended the elimination of the white armbands also, but the record fails to indicate that this was generally achieved, another indication of hasty staff work.

It is undisputed that there occurred in fact no substantial disruption on October 15, 1969, in defendants' schools, either before or after the removal of the black armband wearers. There was also no disruption that day in schools outside defendants' jurisdiction, but in the same general area of Texas, for example in the nearby city of Fort Worth, where the black armbands were tolerated throughout.

None of the school officials who testified expected the wearers of the black armbands to initiate disruption. Rather they believed that the black armbands incensed students not participating in the protest because they gave a false impression of the attitudes general in the schools. The question of public image was important because the media with TV cameras were present at the scene. It was feared that white armband wearers would tear the black armbands off the arms of those who wore them. To dissuade this, school officials urged white armband wearers to restrain themselves, saying that this was an administration matter and administration would take the necessary action. There is no mention of any perceived necessity to urge restraint on black armband wearers.

Nevertheless, counsel for defendants have urged, and still do, that by wearing black armbands plaintiffs and others proclaimed their adherence to the entire program of the Moratorium Committee including its proposals for interruption of school work. Hence, it is said, school officials could use the black armbands to identify the potential disrupters and had a duty to stop them before they could carry out any of their program. This ignores the manifestos referred to above. Exhibit 1 clearly proposes the black armbands as "either—or" alterna-tives to other measures. Counsel abandons the testimony of defendants' own witnesses as to how the disruption was expected to commence. And he calls on us to subscribe to a kind of "guilt by association" (Elfbrandt v. Russell, 384 U.S. 11, 19, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966), and cases cited therein), particularly obnoxious in the case of an organization like the Moratorium Committee, having so far as appears, no clearly defined membership. Whatever the black armbands may have communicated, the record is devoid of any evidence that it did in fact communicate to any witness an intention on plaintiffs' part to engage personally in the feared disruptive actions.

■ We assume that the School Board was not necessarily required by the First Amendment to wait until disruption actually occurred. Likewise, we agree that, antecedently considered, as they had a right and duty to consider the problem, disruption on October 15, 1969, was proved to be a likely contingency. We do not agree that this expectation sufficed per se to justify suspending the exercise of what we are taught by Tinker is a constitutional right. What more was required at least was a determination, based on fact, not intuition, that the expected disruption would probably result from the exercise of the constitutional right and that foregoing such exercise would tend to make the expected disruption substantially less probable or less severe.

The boy who came to school flaunting his Nazi symbols was also, of course, communicating his ideas in his own fashion. However, the black armbands were more adult, more rational adornments. The use of the ancient symbol of mourning as a propagandistic device is clever precisely for the reason that it should put others differently minded on their best behavior. After all over 44,000 Americans have died in Vietnam and all of us must mourn them. We differ only in what we think the President and Congress ought to do to end the bloodshed. The difference between

merely unwise or unpopular language and "fighting words" is well recognized in First Amendment cases. *Compare,* Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), and Edwards v. South Carolina, 372 U.S. 229, 236, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), with Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 267 (1951). What seems clear is that black armbands are not *per se* akin to "fighting words," just because armbands of other colors, or shirts, or hats, have sometimes been so. Therefore, even in the school environment, where no doubt restraints are necessary that the First Amendment would not tolerate on the street, something more is required to establish that they would cause "disruption" than the *ex cathedra* pronouncement of the superintendent.

There is nothing in the instant record to show, *e. g.* conferences with leaders of the student factions, which might have developed solid information as to their attitudes and intentions. The school system had programs in which students were encouraged to speak out about current issues including Vietnam, in order to develop them as national leaders of the future, but no use apparently was made of this machinery to bring leaders of the white armband faction together with the black armbands to agree on mutual respect for each other's constitutional rights. If this had been tried and failed, the failure would have tended to establish that armbands of all colors should be banned. In short, it appears to us that the school system was confronted with a rapidly developing crisis, for which it had no policy predetermined, and instead of obtaining an answer through democratic processes, it responded with a hasty ukase.

Our difference with the trial court therefore is that we do not agree that the precedential value of the *Tinker* decision is nullified whenever a school system is confronted with disruptive activities or the possibility of them. Rather we believe that the Supreme Court has declared a constitutional right which school authorities must nurture and protect, not extinguish, unless they find the circumstances allow them no practical alternative. As to the existence of such circumstances, they are the judges, and if within the range where reasonable minds may differ, their decisions will govern. But there must be some inquiry, and establishment of substantial fact, to buttress the determination.

So far as the record shows, the plaintiffs would still like to wear black armbands to school and defendants would prevent their doing so. If these conflicting resolves have in any way moderated, the record does not so disclose, and mootness is not suggested. Therefore, plaintiffs are entitled to the injunction they request.

The complaint alleged that their exclusion from classes caused them to miss instruction they would otherwise have received. Except for one young man who was excluded from IBM work for the remainder of the term, the amount of teaching that was missed was slight and no doubt was soon made up. The IBM work was not a credit course. If, however, any makeup work is required to put any plaintiff where he would have been as to school advancement if not excluded because of his black armband, the District Judge can provide for the situation in framing the injunction.

The order entered by the District Court denying the injunction sought is hereby vacated, the judgment is reversed and the cause is remanded with direction to the District Court to grant an injunction enjoining defendants from interfering with plaintiffs in the exercise of their First Amendment right by wearing black armbands to school to protest the Vietnam war.

Reversed and remanded.