NANCY OXFELD, BY HER PARENT AND NATURAL GUARD-
IAN, EMIL OXFELD, PETITIONER-APPELLANT, AND
JEFFREY GOODMAN, BY HIS PARENT AND NATURAL
GUARDIAN, SAMUEL GOODMAN; DONALD STRAUSS,
BY HIS PARENT AND NATURAL GUARDIAN, DR. F.
STRAUSS; DANIEL LIPPMAN, BY HIS PARENT AND
NATURAL GUARDIAN, DR. H. E. LIPPMAN; KENNETH
SCHACHAT, BY HIS PARENT AND NATURAL GUARD-
IAN, HERBERT SCHACHAT; GINA NOVENDSTERN, BY
HER PARENT AND NATURAL GUARDIAN, LEON NO-
VENDSTERN; JILL KESSLER, BY HER PARENT AND
NATURAL GUARDIAN, EDWARD KESSLER; PETER
SHAPIRO, BY HIS PARENT AND NATURAL GUARDIAN,
DR. MYRON J. SHAPIRO, PETITIONERS, v. NEW JERSEY
STATE BOARD OF EDUCATION AND BOARD OF EDUCA-
TION OF SOUTH ORANGE-MAPLEWOOD, ESSEX
COUNTY, RESPONDENTS-RESPONDENTS.

Argued September 26, 1973—Reargued November 4, 1974—
Decided September 16, 1975.

Mr. *Lewis M. Holland* argued the cause for appellant (*Messrs. Chasan, Leyner, Holland and Tarleton,* attorneys).

*Mrs. Joyce Usiskin and Miss Mary Ann Burgess,* Deputy Attorneys General, argued the cause for respondent New Jersey State Board of Education (*Mr. George F. Kugler, Jr., and Mr. William F. Hyland,* Attorneys General, attorneys; *Mr. Stephen Skillman,* Assistant Attorney General, of Counsel; *Mrs. Usiskin,* on the Brief).

Mr. *David Samson* argued the cause for respondent Board of Education of South Orange-Maplewood (*Messrs. Lieb, Wolff & Samson,* attorneys; *Mr. Samson,* on the Brief).

PER CURIAM. These proceedings challenge the constitutionality of a school regulation governing student distribution of pamphlets and leaflets on school grounds. Out of deference to our dissenting colleagues we withheld announcement of our decision in the case, it being anticipated that some guidance to those who felt obliged to address the merits might be forthcoming from the United States Supreme Court. While this case was pending here, the Supreme Court heard argument in *Bd. of School Comm'rs, Indianapolis v. Jacobs,* 420 *U. S.* 128, 95 S. Ct. 848, 43 *L. Ed.* 2d 74 (1975), wherein students sought to enjoin enforcement of certain rules imposing restraints prior to distribution on school grounds of a student publication. The issue below had been whether the students' First and Fourteenth Amendment rights were violated by the regulations, and the students had prevailed on the merits in the District Court, *Jacobs v. Bd. of School Comm'rs, Indianapolis,* 349 *F. Supp.* 605 (S. D. Ind. 1972), and in the Court of Appeals, 490 *F.* 2d 601 (7th Cir. 1973). However, the Su-

preme Court did not reach the merits of the case, but rather determined that the matter had become moot.

This case presents substantially the same issues on federal and state constitutional grounds. It puts in question the validity of a literature-distribution regulation or "guidelines" promulgated at Columbia High School, within the jurisdiction of the Board of Education of South Orange-Maplewood. The Commissioner of Education approved the regulation and the State Board of Education affirmed that determination.

Petitioner Oxfeld appealed, and the Appellate Division affirmed unanimously in an unreported opinion which observed that "the present appeal may be moot, since it is questionable whether it asserts a justiciable claim for relief." Nevertheless the case was there disposed of on the merits by an affirmance for the reasons given by the tribunals which had heard the case below. Petitioner's appeal to this Court is based upon a substantial constitutional issue, R. 2:2–1(a)(1).

The case is indeed moot, as it was when decided in the Appellate Division. Neither the petitioner-appellant nor any of the other original named petitioners is any longer a student at Columbia High School. They are not now nor have they for some time been subject to the regulation's force. Further, we do not view this case as presenting any issue of great public importance compelling definitive resolution despite mootness,[1] see, e. g., Roe v. Wade, 410 U. S. 113, 93

---

[1]Nor are the circumstances such that we should save this case from its obvious mootness by recognizing it as a class action. Designating a cause in the pleadings a class action, as petitioners did here, does not make it one, see 3B J. Moore, Federal Practice, ¶ 23.02–2, at 152 (2d ed. 1974) ; at some point a court must determine whether a class action may be maintained, R. 4:32–2(a). That has never been done in this case. While relief was sought, in the original petition, not only on behalf of certain students who had been suspended and, "with regard to the chilling effect of the said regulation, on behalf of all students at Columbia High School," the plain fact of the matter is that no one concerned with this litigation has treated

S. Ct. 705, 35 *L. Ed.* 2d 147 (1973); *John F. Kennedy Memorial Hosp. v. Heston,* 58 *N. J.* 576 (1971); *Busik v. Levine,* 63 *N. J.* 351, appeal dismissed, 414 *U. S.* 1106, 94 S. Ct. 831, 38 *L. Ed.* 2d 733 (1973); *Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n.,* 64 *N. J.* 17 (1973).

Under the circumstances we decline to review the decision of the educational authorities and the tribunal below. The appeal is:

Dismissed. No costs.

CLIFFORD, J. (dissenting). By declaring this case moot the Court effectively permits the survival of a regulation imposing a continuing, systematic prior restraint on student distribution of written materials on school grounds. That regulation is challenged as being violative of the First and Fourteenth Amendments to the United States Constitution and of Article I, ¶ 6, of the New Jersey Constitution.[1]

The constitutional deprivation allegedly being visited upon students at Columbia High School strikes me as quite sufficient reason for deciding the case on its merits. And if that were not enough, we need only consider what we learned at oral argument — that the Commissioner of Education approved the same regulation or "guidelines" under attack in this case as a model for other school districts, and that thereafter some 35 or 40 other districts adopted the

it as having any "class" character since the original pleadings were filed. Significantly, petitioners have never mentioned, let alone stressed, the "class" nature of the litigation during the administrative or judicial proceedings, including their presentation before this Court. *Cf. Danner v. Phillips Petroleum Co.,* 447 *F.* 2d 159, 164 (5th Cir. 1971). With the case at bar in this posture we neither confront any issue nor ground any determination in the context of a class action.

[1]Article I, ¶ 6, states:

Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. * * *

same regulation word for word. Consequently, under the Commissioner's imprimatur some three dozen school districts, involving thousands of students, are presently affected by the Court's decision. Hence we are dealing not with an issue of local impact but rather with one having far-reaching effects.

This Court does not labor under quite the same strictures as does the United States Supreme Court in determining whether or not to decide a case. While the Supreme Court is "limited by the case and controversy requirement of Art. III to adjudication of actual disputes between adverse parties," *Richardson v. Ramirez,* 418 *U. S.* 24, 36, 94 S. Ct. 2655, 2662, 41 *L. Ed.* 2d 551, 560 (1974), rev'g *sub nom. Ramirez v. Brown,* 9 *Cal.* 3d 199, 107 *Cal. Rptr.* 137, 507 P. 2d 1345 (Sup. Ct. 1973), as was the case in *Bd. of School Comm'rs, Indianapolis v. Jacobs,* 420 *U. S.* 128, 129, 95 S. Ct. 848, 850, 43 *L. Ed.* 2d 74, 78 (1975) ("a case or controversy no longer exists"), our State constitution imposes no such similar restraint on the exercise of our judicial power. *Crescent Park Tenants Ass'n v. Realty Equities Corp. of N. Y.,* 58 *N. J.* 98, 107 (1971). Rather, we look to "a sufficient stake and real adverseness" in the litigants, *id.,* or to "issues of great public importance * * *." *In re Geraghty,* 68 *N. J.* 209, 212 (1975). See *State v. Perricone,* 37 *N. J.* 463, 469, *cert.* den., 371 *U. S.* 890, 83 S. Ct. 189, 9 *L. Ed.* 2d 124 (1962) ; *John F. Kennedy Memorial Hosp. v. Heston,* 58 *N. J.* 576, 579 (1971).

Inasmuch as all the parties refrained from raising the mootness issue in this Court despite the clear signal from the Appellate Division, I would assume that "all are desirous of having some judicial expression * * * for future guidance." *Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n,* 64 *N. J.* 17, 22 (1973). Under the circumstances I conclude that there still exists an adversary proceeding, that a broad public interest against prior restraints is involved, that the circumstances which gave rise to this litigation are

likely to recur, and that the issue presented is one requiring statewide uniformity of resolution. See *Ramirez v. Brown, supra,* 9 *Cal.* 3d at 203, 107 *Cal. Rptr.* at 139, 507 P. 2d at 1347. Accordingly, I would decide the case on the merits.

I

This case originated with the filing of a petition with the Department of Education of the State of New Jersey on behalf of eight students at Columbia High School, which comes under the general direction and supervision of the Board of Education of South Orange-Maplewood (hereinafter local Board) and is the senior high school in its District. That petition alleged that on or about December 1, 1968, the local Board promulgated a regulation prohibiting students at the high school "from distributing pamphlets and leaflets in Columbia High School and on the grounds appurtenant thereto."

It further charged that on March 27, 1969, the student petitioners and others were suspended from classes by the principal of Columbia High School, Robert L. Amsden, for distributing leaflets and pamphlets contrary to the regulation.[2] Petitioners claimed they were told the students would be reinstated "only if they would promise not to again thus avail themselves of their said right" to distribute literature. Relief was sought not only for petitioners but also "in behalf of the entire class of Columbia High School students suspended on March Twenty-Seventh, 1969 * * * and, with regard to the chilling effect of the said regulation, on behalf of all students at Columbia High School."[3] Petitioners

---

[2] Copies of the materials distributed were annexed to the petition and may generally be characterized as reflecting opposition to both the Vietnam War and racial oppression.

[3] It is unnecessary to reach any question of the "'class" character of this action, including the question of whether class actions as such are cognizable before an administrative agency. I read the Court's opinion as avoiding (quite properly, I submit) a declaration on any of the possible class action issues.

sought (a) a declaration that the regulation was void, (b) revocation of the suspensions, and (c) a stay of enforcement of the regulation and of the suspensions until final disposition of the petition.

The local Board filed an answer denying that it promulgated the regulation but conceding that the regulation was adopted by the high school principal. While admitting that the student petitioners were suspended from classes, it denied that the distribution of leaflets and pamphlets was protected by any constitutional right of free speech. Separate defenses undertook to justify the regulation by reference to its content, to the circumstances at Columbia High School at the time it was promulgated, and to the obligation of the local Board to "care for as well as educate" children during school hours.

At a hearing conducted in the Department of Education it was revealed that the original regulation grew out of two incidents involving students distributing literature on school grounds. The first of these occurred on Election Day — November 5, 1968 — when a student distributed a handbill in the foyer of the main entrance to the school before classes started. The handbill, which students were free to accept or reject as they wished, criticized the presidential candidates and the way they were selected. Although the activity did not interfere with access to the school and no littering occurred, the student was summoned to the principal's office, informed that his activities were in violation of a New Jersey statute,[4] and suspended.

A few days later a second literature-distribution incident occurred when students passed out leaflets protesting the

---

[4] The statute referred to was *N. J. S. A.* 18A:42–4. It is plainly inapplicable inasmuch as it prohibits distribution to students on school grounds of any literature regarding annual school elections, or the adoption of any bond issues, proposals or public question, "for the purpose of having such pupil take the same to his home or distribute it to any person outside of said building * * *."

first student's suspension and advocating freedom of speech. Again the distribution was made before school hours, and there were no acts of violence or disruption of normal school activities. Nevertheless, these students also were instructed to cease the distribution and to report to the principal's office.

It was less than one month later, on December 1, 1968, that a rule prohibiting all literature distribution on school grounds was promulgated by Mr. Amsden. The testimony of the principal and teachers made plain that it was the general atmosphere of hostility and violence which existed throughout American society at that time, as well as tension and polarization which they sensed in the student body itself, which had led to the literature-distribution ban, rather than any specific acts of violence connected with the distributions or any identifiable racial tensions within the student body.

The distribution incident which gave rise to this suit occurred on the morning of March 27, 1969, when a group of 40 to 50 students passed out leaflets inside and outside the entrances to the school, before the start of classes. These leaflets advocated support for an antiwar rally. There was no littering or violence but the students involved were suspended.

The Commissioner of Education, in his Decision, concluded that to the extent this original regulation constituted "an outright interdiction of any distribution of printed material," it was suppressive and therefore "an improper encroachment upon freedom of expression," and, as such, not sustainable. He went on, however, to hold that there was a "common sense middle ground between the extreme of total proscription and absolute liberty which represents a sound approach to the solution of this problem," and remanded the case to the local Board for the development of guidelines. These were to be cooperatively developed by pupils and faculty, so as not only to define the times and places when materials could be distributed without interfering with the work of the school, but also to include criteria by which the "appropriateness" of the material to be handed out could be adjudged. The Commissioner also held that the current regulation barring

leaflet distribution would be continued in effect until appropriate guidelines and criteria had been adopted and promulgated. He declined to consider the earlier suspensions because those suspended had been reinstated promptly with no damage to their education progress. The Commissioner retained jurisdiction.

In compliance with this decision the student-staff committee met to prepare guidelines "for the distribution of materials outside usual school channels." The following were submitted to the Commissioner:

A. *Places*
   On the school sidewalk in front of the main entrance to building and on the walk in front of the gym lobby. (In case of bad weather, two pupils only would be permitted each in the front main lobby and in the gym lobby. Specific approval to distribute materials inside would be required each time.)

B. *Time*
   7:45 - 8:15 a.m.
   2:46 - 3:15 p.m.

C. *Approval*
   The previous day or earlier by appropriate class dean or principal, if dean should be absent. For materials not readily classifiable or approvable more than one day should be allowed.

D. *Sponsorship*
   For a club or other regular school group, the person who serves regularly as sponsor. He may designate a substitute if he cannot be present during distribution activity. For individual students or a group not formally organized, any willing staff member may serve as sponsor provided he can arrange to be present to prevent problems during distribution activity.

E. *Littering*
   All distributed items which are dropped in the immediate area (on the front sidewalk and lawn adjacent to the street, for example, or the two inside lobbies and adjacent corridor for 50–75 feet) must be removed by persons distributing the material. Waste baskets will be provided.

F. *Unacceptable items*
   So-called "hate" literature which scurrilously attacks ethnic, religious and racial groups, other irresponsible publications aimed at creating hostility and violence, hardcore pornography, and similar materials are not suitable for distribution in the schools.
   Materials denigrating to specific individuals in or out of the School.
   Materials designed for commercial purposes — to advertise a product or service for sale or rent.

Materials which are designed to solicit funds, unless approved by the Superintendent or his Assistant.

Literature which in any manner and in any part thereof promotes, favors or opposes the candidacy of any candidate for election at any annual school election, or the adoption of any bond issue, proposal, or any public question submitted at any general, municipal or school election.

G. *Acceptable materials*

Materials not proscribed in section *F* unless dean or principal should be convinced that the items would materially disrupt class-work or involve substantial disorder or invasion of the rights of others.

H. *Appeal*

Pupil denied approval may appeal to the Principal who with a student advisory committee of one representative from each class will review the matter. Should the petition be denied, the petitioner may still appeal to the Superintendent, then to the Board of Education, etc.

In keeping with his retention or jurisdiction, the Commissioner of Education reviewed the guidelines and found them generally acceptable" with the exception of provision "D" dealing with "Sponsorship." The Commissioner directed that the remaining guidelines "be adopted by the [local Board] as adequate and appropriate controls for the distribution of student newspapers and leaflets."[5] Because I believe these guidelines to be violative of basic constitutional rights, I would reverse the judgment of the Appellate Division which approved the administrative decision.

II

For more than fifty years the Supreme Court has acknowledged the Constitution's vitality within the schoolhouse. See *Tinker v. Des Moines Independent Community School Dist.*, 393 *U. S.* 503, 506–07, 89 S. Ct. 733, 736–37, 21 *L. Ed.* 2d 731, 737–38 (1969), and cases cited therein.

---

[5] While this is the language of the Commissioner's Decision on Remand, I take it to mean only that he was indicating approval of that which had been submitted to him and not that he was "ordering" the implementation of the guidelines.

More than thirty years ago, in *West Virginia State Bd. of Educ. v. Barnette,* 319 *U. S.* 624, 637, 63 S. Ct. 1178, 1185, 87 L. Ed. 1628, 1637 (1943), Mr. Justice Jackson wrote:

> The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures — Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. *That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual,* if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes. (emphasis added)

With respect to the rights of students under the First Amendment, the Court has demonstrated conspicuous sensitivity. It has declared flatly that "the First Amendment leaves no room for the operation of a dual standard in the academic community * * *." *Papish v. Univ. of Mo.,* 410 *U. S.* 667, 671, 93 S. Ct. 1197, 1200, 35 *L. Ed.* 2d 618, 622 (1973).

The force of this message is in no wise diluted by virtue of its application in this case to high school pupils as distinguished from college-age students or older adults. *Tinker* held that high school and junior high school officials had transgressed their authority by refusing to let students wear black arm bands in protest of the Vietnam War, a symbolic act "closely akin to 'pure speech' * * * entitled to comprehensive protection under the First Amendment." 393 *U. S.* at 505–06, 89 S. Ct. at 736, 21 *L. Ed.* 2d at 737.[6] It has been suggested that students' constitutional rights are to be "applied in light of the special characteristics of the school environment," *Tinker, supra,* 393 *U. S.* at 506, 89 S. Ct. at 736, 21 *L. Ed.* 2d at 737, and that First Amendment rights of

---

[6]Petitioners in *Tinker* were 13 (eighth grade), 15 (eleventh grade), and 16 years old (eleventh grade). Affected by the order of the authorities were other students ages 8 (second grade) and 11 (fifth grade).

children may in certain respects be more broadly regulated than those of adults. Compare *Ginsberg v. New York,* 390 *U. S.* 629, 637–43, 88 S. Ct. 1274, 1279–83, 20 *L. Ed.* 2d 195, 203–06 (1968) (obscenity of material determined on the basis of its appeal to minors under age 17, whether or not it would be obscene to adults) with *Quarterman v. Byrd,* 453 *F.* 2d 54, 57–59 (4th Cir. 1971); *cf.* Haskell, "Student Expression in the Public Schools: *Tinker* Distinguished," 59 *Geo. L. J.* 37, 57–58 (1970); Wright, "The Constitution on Campus," 22 *Vand. L. Rev.* 1027, 1052–53 (1969). Nevertheless, the Supreme Court has specifically refrained from drawing any limiting distinction in the context of high school students' speech, despite a clear invitation to do so by Mr. Justice Stewart in his concurring opinion in *Tinker, supra,* 393 *U. S.* at 515, 89 S. Ct. at 741, 21 *L. Ed.* 2d at 742.

None of this is to say, however, that student speech can be subject to no regulation whatsoever. Of course it can. The Court has recognized the comprehensive authority of school officials generally to prescribe and control day-to-day operations, *e. g., Epperson v. Arkansas,* 393 *U. S.* 97, 104, 89 S. Ct. 266, 270, 21 *L. Ed.* 2d 228, 234 (1968), and particularly to impose "reasonable regulations with respect to the time, the place, and the manner in which student groups conduct their speech-related activities * * *." *Healy v. James,* 408 *U. S.* 169, 192–93, 92 S. Ct. 2338, 2352, 33 *L. Ed.* 2d 266, 286 (1972). See, *e. g., Papish v. Univ. of Mo., supra,* 410 *U. S.* at 670, 93 S. Ct. at 1199, 35 *L. Ed.* 2d at 622. And, as will be seen, student speech may be interrupted and terminated in the event its continuation could reasonably be forecast to produce disruption. See *Fujishima v. Bd. of Educ.,* 460 *F.* 2d 1355, 1358 (7th Cir. 1972). The problem arises—as it did in the case *sub judice*—when students' rights of free expression come into collision with the school's interest in maintaining an atmosphere conducive to education. At that point some balancing of the competing interests

must occur. I understand the law to weight that balance in favor of student expression.

Doubtless there are those who look upon such a course as smacking too much of permissiveness.[7]  Certainly it is po-

---

[7]One detects that Mr. Justice Black might have numbered himself among them. Witness the following from his vigorous dissent in *Tinker* :

The original idea of schools, which I do not believe is yet abandoned as worthless or out of date, was that children had not yet reached the point of experience and wisdom which enabled them to teach all of their elders. It may be that the Nation has outworn the old-fashioned slogan that "children are to be seen and not heard," but one may, I hope, be permitted to harbor the thought that taxpayers send children to school on the premise that at their age they need to learn, not teach.

*          *          *          *          *          *          *          *

One does not need to be a prophet or the son of a prophet to know that after the Court's holding today some students in Iowa schools and indeed in all schools will be ready, able, and willing to defy their teachers on practically all orders. This is the more unfortunate for the schools since groups of students all over the land are already running loose, conducting break-ins, sit-ins, lie-ins, and smash-ins. Many of these student groups, as is all too familiar to all who read the newspapers and watch the television news programs, have already engaged in rioting, property seizures, and destruction. They have picketed schools to force students not to cross their picket lines and have too often violently attacked earnest but frightened students who wanted an education that the pickets did not want them to get. Students engaged in such activities are apparently confident that they know far more about how to operate public school systems than do their parents, teachers, and elected school officials. It is no answer to say that the particular students here have not yet reached such high points in their demands to attend classes in order to exercise their political pressures. Turned loose with lawsuits for damages and injunctions against their teachers as they are here, it is nothing but wishful thinking to imagine that young, immature students will not soon believe it is their right to control the schools rather than the right of the States that collect the taxes to hire the teachers for the benefit of the pupils. This case, therefore, wholly without constitutional reasons in my judgment, subjects all the public schools in the country to the whims and caprices of their loudest-mouthed, but maybe not their brightest, students. I, for one, am not fully persuaded that school pupils are wise enough, even with this Court's expert help from Washington, to run the 23,390 public

litically popular to refuse permission for certain abrasive speakers to address students, or to deny recognition to some activist organizations, or to expel abruptly a militant demonstrator. And yet, as Professor Charles Alan Wright has pointed out, "here is the Constitution, which says that none of these things can be done." "The Constitution on Campus," *supra,* 22 *Vand. L. Rev.* at 1084.

While I am certain the Constitution allows *regulation* of student speech because of its potential for producing disorder, I am equally certain that when such regulation takes the form of prior restraints, it is presumptively invalid. See generally Gyory, "The Constitutional Rights of Public School Pupils," 40 *Fordham L. Rev.* 201 (1971); Note, "Prior Restraints in Public High Schools," 82 *Yale L. J.* 1325 (1973).

## III

At this point some definition of the concept of prior restraint, which has been described as "curiously confused and unformed" despite an "ancient and celebrated history," Emerson, "The Doctrine of Prior Restraints," 20 *Law & Contemp. Prob.* 648, 649 (1955), should be attempted. Professor Emerson commences:

The concept of prior restraint, roughly speaking, deals with official restrictions imposed upon speech or other forms of expression in advance of actual publication. Prior restraint is thus distinguished from subsequent punishment, which is a penalty imposed after the communication has been made as a punishment for having made it. Again speaking generally, a system of prior restraint would prevent communication from occurring at all; a system of subsequent punishment allows the communication but imposes a penalty after the event. Of course, the deterrent effect of a later penalty may operate to prevent a communication from ever being made. Nevertheless, for a

school systems in our 50 States. I wish, therefore, wholly to disclaim any purpose on my part to hold that the Federal Constitution compels the teachers, parents, and elected school officials to surrender control of the American public school system to public school students. [393 *U. S.* at 522–26, 89 S. Ct. at 745, 21 *L. Ed.* 2d at 747–49 (footnote omitted).]

variety of reasons, the impact upon freedom of expression may be quite different, depending upon whether the system of control is designed to block publication in advance or deter it by subsequent punishment. [*Id.* at 648]

Prior restraints may take the form of a requirement of prior approval to publish (the "clearest form," *id.* at 655) ; of enjoining future publication on the basis of what has been said or written before; of the imposition of specific conditions to communication (registration of lobbyists, for example) ; or of various kinds of secondary limitations (such as loyalty oath requirements). *Id.* at 655–56.

If we accept the principle that "freedom of expression is the rule and constraint the exception," *id.* at 655, then we are led ineluctably to the notion that prior restraints are absolutely destructive of the essential freedoms guaranteed by the First Amendment.[8] Prior restraints of even the most seemingly innocuous nature carry with them the seeds of destruction of expression; they "drive irresistably toward unintelligent, overzealous, and usually absurd administration." *Id.* at 658.

Prior restraint lies at the very core of the evil against which the basic objectives of the First Amendment seek to protect. *Near v. Minn.,* 283 *U. S.* 697, 713, 51 S. Ct. 625, 630, 75 *L. Ed.* 1357, 1366 (1931). See *Police Dep't v. Mosley,* 408 *U. S.* 92, 95, 92 S. Ct. 2286, 2290, 33 *L. Ed.* 2d 212, 216 (1972). Its perniciousness surfaces in its singular effectiveness in stifling an idea before it reaches the

---

[8]As Blackstone observed:

The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every free man has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous or illegal, he must take the consequences of his own temerity. [Emerson, "The Doctrine of Prior Restraints," 20 *Law & Contemp. Prob.* 648, 651, quoting from 4 *Bl. Comm.* 151–52 (emphasis in original).]

audience. Recognizing this, the landmark case of *Near v. Minn., supra,* stated that prior restraints are acceptable only in "exceptional cases," an example of which, it suggested, might be obstruction of wartime recruiting effort. 283 *U. S.* at 716, 51 S. Ct. at 631, 75 *L. Ed.* at 1367. Thus it is that "[a]ny prior restraint on expression comes to [the Supreme Court] with a 'heavy presumption' against its constitutional validity." *Organization for a Better Austin v. Keefe,* 402 *U. S.* 415, 419, 91 S. Ct. 1575, 1578, 29 *L. Ed.* 2d 1, 5 (1971). See *New York Times Co. v. United States,* 403 *U. S.* 713, 91 S. Ct. 2140, 29 *L. Ed.* 2d 822 (1971).[9]

## IV

The First Amendment's abhorrence of prior restraint, a similar distaste for which is found in the New Jersey Constitution (see footnote 1 *supra,* at 304), is by force of logic carried into the schoolhouse along with other accoutrements of that Amendment's preferred status.

*Tinker* tells us that to justify suppression of student expression the authorities must be able to demonstrate "facts which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities," 393 *U. S.* at 514, 89 S. Ct. at 740, 21 *L. Ed.* 2d at 742, or which involved "substantial * * * invasion of the rights of others." *Id.* at 513, 89 S. Ct. at 740, 21 *L. Ed.* 2d at 741. This reasonable forecast of disruption is a thresh-

---

[9]The area of obscenity regulation represents an exception to the Supreme Court's rejection of efforts to impose prior restraints. Obscenity, not deemed a fit subject for First Amendment protection, may be required to be screened out prior to a public showing, *Times Film Corp. v. Chicago,* 365 *U. S.* 43, 81 S. Ct. 391, 5 *L. Ed.* 2d 403 (1961), but even this exception is specifically restricted to motion pictures and is laden with rigid procedural safeguards, *Freedman v. Maryland,* 380 *U. S.* 51, 85 S. Ct. 734, 13 *L. Ed.* 2d 649 (1965). Regulations seeking to impose on books prior restraints based on obscenity have been struck down by the Court. *E. g., Bantam Books, Inc. v. Sullivan,* 372 *U. S.* 58, 83 S. Ct. 631, 9 *L. Ed.* 2d 584 (1963).

old requirement that must be satisfied *before* speech can be restrained, and such a forecast must be based on a factual inquiry into and appraisal of student conduct.

In making that forecast there must be kept in mind the established principle that hostile audiences which threaten disruption are alone not justification for curbing a speaker. Rather, it is the audience which must be quieted. See *Terminiello v. Chicago,* 337 *U. S.* 1, 5, 69 S. Ct. 894, 896, 93 *L. Ed.* 1131, 1135 (1949). Thus, when the apprehended result of speech is disruption, it is only when such words create a clear and present danger, see *Schenck v. United States,* 249 *U. S.* 47, 52, 39 S. Ct. 247, 249, 63 *L. Ed.* 470, 473–74 (1919), or when the speaker's words become "fighting words," see *Chaplinsky v. New Hampshire,* 315 *U. S.* 568, 572, 62 S. Ct. 766, 769, 86 *L. Ed.* 1031, 1035 (1942), that expression may be suppressed.[10]

Application of this "forecast" rule is not without difficulty. As indicated in Note, "Prior Restraints in Public High Schools," *supra,* 82 *Yale L. J.* at 1332:

> On its face, the *Tinker* rule, which permits regulation to be based on a "forecast" of disorder, might seem to sanction prior restraints as a means of making that forecast. This possibility must be dismissed, however, when the relationship of the *Tinker* test to other tests is understood. Consider the "clear and present danger" and the "incitement" tests. They are of the same type as the *Tinker* test in two respects. First, each identifies a level of disorder justifying state regulation of speech. And second, each is "prediction" oriented: Neither requires the state to wait until the forbidden level of disorder has developed before taking action. But neither test — notwithstanding the sanction for regulation based on prediction — has been thought to authorize prior restraints as a means of disorder prediction. These tests differ from the *Tinker* test in the level of disorder which justifies regulation, *not* in the means of prediction which are appropriate. (emphasis in original)

---

[10] So it is that action, as distinguished from expression, "carries no first amendment shield and can be regulated in any way that the public health, safety, morals and welfare require." Wright, "The Constitution on Campus," 22 *Vand. L. Rev.* 1027 at 1039 (1969).

The point to be made here is that the "forecast" requirement does not oblige the school authorities to give way to the First Amendment until a disruption has actually occurred. What I take *Tinker* to demand is "a determination, based on fact, not intuition, that the expected disruption would probably result from the exercise of the constitutional right and that foregoing such exercise would tend to make the expected disruption substantially less probable or less severe." *Butts v. Dallas Independent School Dist.,* 436 *F.* 2d 728, 731 (5th Cir. 1971). Or, as expressed by the court in *Fujishima v. Bd. of Educ., supra,* 460 *F.* 2d at 1358, the "use of the word 'forecast' in *Tinker* means a prediction by school officials that existing conduct, such as the wearing of arm bands — *if allowed to continue* — will probably interfere with school discipline." (emphasis added)

The ease with which the test is expressed does not mask the difficulty of its application. Perhaps by this point the complexities of this general area of First Amendment law have become apparent. If not, a perusal of the lower court cases may make them so.[11] As one might anticipate, they are not in complete accord. Those which follow the formula of denying regulation of content usually make the point that the prior restraints are not per se unconstitutional, and that control of the time, place and manner of speech or of written material's distribution is permissible. Those which uphold the concept of what they call prior restraint generally emphasize the authority of the

---

[11]It is not difficult to understand the frustration voiced by Judge (now Chief Judge) Kaufman in a footnote to *Eisner v. Stamford Bd. of Educ.,* 440 *F.* 2d 803, 804–05, n. 1 (2d Cir. 1971) :

The problems raised by this case defy geometric solutions. The best one can hope for is to discern lines of analysis and advance formulations sufficient to bridge past decisions with new facts. One must be satisfied with such present solutions and cannot expect a clear view of the terrain beyond the periphery of the immediate case. It is a frustrating process which does not admit of safe analytical harbors.

state "to minimize or eliminate influences that would dilute or disrupt the effectiveness of the educational process as the state conceives it." *Eisner v. Stamford Bd. of Educ.,* 440 *F.* 2d 803, 807 (2d Cir. 1971). There is not uniformity of definition of what in fact constitutes a prior restraint. The structuring which Professor Emerson, *op. cit., supra,* has attempted to bring to this subject is, for whatever reason, infrequently and not at all fastidiously observed. There is little consistency of approach.[12]

---

[12]Cases striking down prior restraints in the academic context include: *Brooks v. Auburn Univ.,* 412 *F.* 2d 1171 (5th Cir. 1969); *Butts v. Dallas Independent School Dist.,* 436 *F.* 2d 728 (5th Cir. 1971); *Riseman v. School Comm.,* 439 *F.* 2d 148 (1st Cir. 1971); *Univ. of S. Miss., M.C.L.U. v. Univ. of S. Miss.,* 452 *F.* 2d 564 (5th Cir. 1971); *Fujishima v. Bd. of Educ.,* 460 *F.* 2d 1355 (7th Cir. 1972); *Bazaar v. Fortune,* 476 *F.* 2d 570, modified, 489 *F.* 2d 225 (5th Cir. 1973), cert. den., 416 *U. S.* 995, 94 S. Ct. 2409, 40 *L. Ed.* 2d 774 (1974); *Joyner v. Whiting,* 477 *F.* 2d 456 (4th Cir. 1973); *Jacobs v. Bd. of School Comm'rs, Indianapolis,* 490 *F.* 2d 601 (7th Cir. 1973), vacated as moot, 420 *U. S.* 128, 95 S. Ct. 848, 43 *L. Ed.* 2d 74 (1975); *Hammond v. South Carolina State College,* 272 *F. Supp.* 947 (D. S. C. 1967); *Snyder v. Bd. of Trustees,* 286 *F. Supp.* 927 (N. D. Ill. 1968); *Zucker v. Panitz,* 299 *F. Supp.* 102 (S. D. N. Y. 1969); *Smith v. Univ. of Tenn.,* 300 *F. Supp.* 777 (E. D. Tenn. 1969); *Lee v. Bd. of Regents,* 306 *F. Supp.* 1097 (W. D. Wis. 1969), aff'd, 441 *F.* 2d 1257 (7th Cir. 1971); *Antonelli v. Hammond,* 308 *F. Supp.* 1329 (D. Mass. 1970); *Korn v. Elkins,* 317 *F. Supp.* 138 (D. Md. 1970); *Trujillo v. Love,* 322 *F. Supp.* 1266 (D. Colo. 1971); *Poxon v. Bd. of Educ.,* 341 *F. Supp.* 256 (E. D. Cal. 1971); *Vail v. Bd. of Educ.,* 354 *F. Supp.* 592 (D. N. H. 1973); *Panarella v. Birenbaum,* 37 *A. D.* 2d 987, 327 *N. Y. S.* 2d 755 (App. Div. 1971).

In some instances in which the regulation in question has been invalidated, the court nevertheless made it quite clear that it did not disapprove the concept of some prior approval system. *E. g., Eisner v. Stamford Bd. of Educ.,* 440 *F.* 2d 803 (2d Cir. 1971); *Quarterman v. Byrd,* 453 *F.* 2d 54 (4th Cir. 1971); *Shanley v. Northeast Independent School Dist.,* 462 *F.* 2d 960 (5th Cir. 1972); *Baughman v. Freienmuth,* 478 *F.* 2d 1345 (4th Cir. 1973).

Curtailment of First Amendment activity has been upheld in cases of reasonably anticipated disruption, *Karp v. Becken,* 477 *F.* 2d 171 (9th Cir. 1973); *Speake v. Grantham,* 317 *F. Supp.* 1253 (S. D. Miss. 1970), aff'd., 440 *F.* 2d 1351 (5th Cir. 1971); in cases of obscenity, *e. g., Baker v. Downey City Bd. of Educ.,* 307 *F. Supp.* 517

## V

In order to decide the case at hand, fortunately one need not harmonize the discordant results referred to above. No matter how weak or strong a standard is applied — and, to be sure, without resort to what Mr. Justice Stewart has referred to as a "doctrinaire, knee-jerk application of the First Amendment," *Ginsberg v. New York, supra,* 390 *U. S.* at 648, 88 S. Ct. at 1285, 20 *L. Ed.* 2d at 209 — the guidelines in question should be invalidated because of their constitutional infirmity.

First, this school rule contemplates a blanket and continuous restraint with no defined duration. My own examination of the record makes abundantly clear that there was not an acceptable basis for the restraint when first imposed, there being no more than an "undifferentiated fear or apprehension of disturbance," found in *Tinker* to be "not enough to overcome the right to freedom of expression." 393 *U. S.* at 508, 89 S. Ct. at 737, 21 *L. Ed.* 2d at 739. Whatever concern the authorities may have had about possible disruption in the high school was traceable to their perceptions of general conditions in American society and polarization within the student body. This is, needless to say, a legitimate concern; but on the record in this case it is entirely unconnected with the students' exercise of their First Amendment rights.

(C. D. Cal. 1969) ; where students are to be solicited for money, *Katz v. McAulay,* 438 *F.* 2d 1058 (2d Cir. 1971), *cert.* den., 405 *U. S.* 933, 92 S. Ct. 930, 30 *L. Ed.* 2d 809 (1972). *Contra, Jacobs v. Bd. of School Comm'rs, supra.* Where students have been grossly disobedient in refusing to follow school procedures by submitting material to a screening committee, regulations constituting prior restraint have been tolerated or tacitly approved, it having been unnecessary to reach the merits of such regulations. *Sullivan v. Houston Independent School Dist.,* 475 *F.* 2d 1071 (5th Cir.), *cert.* den., 414 *U. S.* 1032, 94 S. Ct. 461, 38 *L. Ed.* 2d 323 (1973) ; *Schwartz v. Schuker,* 298 *F. Supp.* 238 (E. D. N. Y. 1969) ; *Graham v. Houston Independent School Dist.,* 335 *F. Supp.* 1164 (S. D. Tex. 1970). But see *Shuttlesworth v. City of Birmingham,* 394 *U. S.* 147, 89 S. Ct. 935, 22 *L. Ed.* 2d 162 (1969).

But whatever the situation was when the guidelines were promulgated to become effective during the 1969-70 school year, that situation has changed — both in this country generally and doubtless at Columbia High School. That peculiar phenomenon euphemistically known as "campus unrest" (and bringing with it sometimes tragic consequences) is, to the vast relief of most and the disgruntlement of some, apparently behind us. The dire consequences which Mr. Justice Black predicted would befall us in the wake of *Tinker* (see footnote 7 *supra,* at 313) have not come to pass. The circumstances in which the guidelines were spawned no longer prevail. The prohibitions of these guidelines, then, were and are imposed with no regard to a likelihood of disturbances which might result. There is no standard limiting suppression of materials to those instances where the material would interfere with the running of the school, cause violence or disorder, or invade the rights of others. The asserted justification for their existence (which, as I have endeavored to make clear, is no justification at all) having long since disappeared, the guidelines should not be permitted to survive at Columbia High School and certainly not as a model to be adopted by other school districts. From this it can be seen that in my view any rule which results in suppression of speech should have vitality only for so long as the volatile situation in which it originates continues, after which it should expire.

In addition to constituting a patent and unabashed regulation of content by banning specified "unacceptable materials," these guidelines suffer on account of vagueness. What is material which is "denigrating to specific individuals"? What would fall into the classification of "irresponsible publications aimed at creating hostility and violence"? These terms could include mildly critical declarations to profane and violent name-calling, and would permit the systematic exclusion of ideas with which the authorities do not want to contend. It seems fair to assume that most

literature, leaflets, and placards of student origin seen about schools will be of the critical and protest variety; any one of them might be interpreted as "creating hostility" depending upon the bent of the person interpreting it.

Likewise, there are no criteria to guide the superintendent or his assistant in determining whether to allow solicitation of funds on school grounds. Certainly such solicitation is, as a general rule, a protected activity when it is part of a presentation of political and social views, see *Schneider v. Irvington*, 308 *U. S.* 147, 60 S. Ct. 146, 84 *L. Ed.* 155 (1939); *Murdock v. Pennsylvania*, 319 *U. S.* 105, 63 S. Ct. 870, 87 *L. Ed.* 1292 (1943). And just as certainly solicitation for private profit can be prohibited in public school and measures can be taken to prevent fraudulent appeals. But there cannot be unbridled discretion in a school official to approve or disapprove soliciting, and the regulation here does not address that problem. See *Schneider v. Irvington, supra; Jacobs v. Bd. of School Comm'rs, Indianapolis, supra.*

In addition there is at least one procedural defect. The regulation places no limitation on the time in which an answer must be given by the administration. See *Eisner v. Stamford Bd. of Educ., supra,* 440 *F.* 2d at 810. Thus, students are likely to be hampered in spontaneous expressions, held to be a significant aspect of First Amendment rights. See, *e. g., Baughman v. Freienmuth,* 478 *F.* 2d 1345, 1348–49 (4th Cir. 1973).

Lastly, I am drawn to the conclusion that in its requirement of submission of materials for approval in advance of distribution (the "clearest form" of prior restraint, according to Emerson), the regulation in question is plainly unconstitutional. While school discipline may very well justify punishment of students for the exercise of some expressional activity, or require the termination of speech or literature distribution which is about to produce a disruption, it cannot stand as the basis for creating a system of prior approval and licensing designed to prevent the exercise of First Amendment rights. *Fujishima v. Bd. of Educ., supra,*

460 *F.* 2d 1355 at 1358. While in practice this may result in the dissemination of materials which some may look upon as ill-mannered, oafish, repulsive, and vulgar, I think the educational system can survive under those conditions without the imposition of prior censorship so repugnant to the First Amendment.

## VI

The notion that courts should not be in the business of operating public schools on a day-to-day basis, while perhaps platitudinous, is nevertheless eminently sound. By this minority opinion I do not intend to signal the desirability of this Court's plunging into that business. I appreciate full well the delicate nature of the difficult task confronting school officials and would only with great reluctance interfere with a good-faith effort to satisfy the problems and needs of Columbia High School. However, the regulation challenged here so directly and sharply implicates basic constitutional values as to justify the intrusion of the judicial process in a high school setting to protect and maintain the integrity of those values.

Singularly appropriate is the following language from *Tinker*:

> Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk * * * and our history says that it is this sort of hazardous freedom — this kind of openness — that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society. [393 *U. S.* at 508–09, 89 S. Ct. at 737, 21 *L. Ed.* 2d at 739 (citation omitted)].

Inasmuch as I view the regulation in question as being invalid and would not permit its enforcement (much less its use as a model), I would reverse the judgment of the Appellate Division.

Mr. Justice PASHMAN authorizes me to indicate that he joins in this dissenting opinion.

*For dismissal*—Chief Justice HUGHES, Justices MOUNTAIN and SULLIVAN and Judge CONFORD—4.

*For reversal*—Justices PASHMAN and CLIFFORD.—2.