**Dorothy A. TRUJILLO, Plaintiff,**

v.

**John A. LOVE, Governor of the State of Colorado, Duke W. Dunbar, Attorney General of the State of Colorado, Robert W. Bartley, William H. Southard, L. Richard Bratton, Phillip M. Lorton, Stuart W. McLaughlin, Mrs. William B. Naugle, C. Gale Sellens, Trustees of State Colleges in Colorado, J. Victor Hopper, President of Southern Colorado State College, Thomas W. McAvoy, Adviser to the Southern Colorado State College Arrow, Defendants.**

Civ. A. No. C–2785.

United States District Court, D. Colorado.

Feb. 11, 1971.

Robert Tabor Booms, American Civil Liberties Union Foundation of Colorado, Inc., Denver, Colo., for plaintiff.

Duke W. Dunbar, Atty. Gen., John P. Moore, Deputy Atty. Gen., and Robert L. Hoecker, Asst. Atty. Gen., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

ARRAJ, Chief Judge.

Plaintiff is a student at Southern Colorado State College who in the fall of 1970 was suspended from her position as managing editor of the college newspaper, the SCSC *Arrow*, after some disagreements with the newspaper's faculty adviser. Plaintiff brought this action seeking a declaration that defendants' conduct in "censoring" her writing and suspending her was an unconstitutional interference with her rights as guaranteed by the first amendment to the United States Constitution. She seeks reinstatement to the position of managing editor, with back pay, and temporary and permanent injunctions restraining defendants from interfering with her freedom of speech. Briefs were submitted and a hearing held on plaintiff's request for a preliminary injunction. The parties have agreed to regard our decision on the preliminary injunction question as dispositive of the merits of the case. The issues are now before us for final determination.

In July, 1970, two events occurred at Southern Colorado State College which, though seemingly unrelated, were to give rise in part to difficulties between plaintiff and members of the SCSC faculty and administration. The first event was the mass communication department's appointment of plaintiff Trujillo, then an *Arrow* staff member, to managing editor of the newspaper. The managing editor's salary was $75 a month and a tuition waiver. In addition, plaintiff Trujillo earned $20 a month as an engraver. The second event was an agreement between SCSC President J. Victor Hopper, a defendant in this action, and representatives of the student government concerning financial support for the newspaper, which, prior to July, 1970, had been financed with student activity fees. Because the students wished to allocate a greater percentage of their fees to other enterprises, Dr. Hopper agreed that the college would assume the cost of printing the *Arrow* and would help with bill collecting. The student government agreed to pay for staff salaries and some supplies. Dr. Hopper announced at a budget meeting that summer that the college was

taking over the role of *Arrow* publisher and that the mass communications department would supervise operation of the *Arrow* as an "instructional tool." While Dr. Hopper testified that the administration and faculty had always "indirectly controlled" the *Arrow* and regarded it as a "laboratory course," neither his testimony nor the testimony of any other witness at the hearing even suggested that this fact was generally known among students or faculty.

The first difficulty occurred after the *Arrow* staff had sent its Welcome Week edition to the printer in the fall of 1970. Thomas W. McAvoy, a teacher in the mass communications department and faculty adviser to the *Arrow*, had visited the printer on a mission unrelated to the subsequent troubles. While reading proof for the Welcome Week edition, he came upon an item by plaintiff Trujillo entitled "Comment—Hopper skirts Coors issue," which concerned the president's decision to close campus "pubs." Accompanying the commentary was a cartoon of President Hopper and below it, in boldface type, the following:

> I will not give in to threats of violence. I shall continue my policy of indecision. I must reiterate that I will not be persuaded by threats of violence. I will follow the will of the student body or any group of them.
> This is my school and if you don't like it, I'll change my mind.—J. V. Hopper (art by wisner)

Defendant McAvoy, persuaded that the caption was potentially libelous and a violation of journalism's canons of ethics, consulted with other faculty members. The acting chairman of the department then ordered the printer to delete the page containing the cartoon and caption. The decision to delete, rather than reset, the page was based upon cost, defendant McAvoy testified.

About a month later plaintiff Trujillo submitted to Mr. McAvoy a proposed editorial on campus parking problems and a proposed column discussing the Colorado attorney general's race then under way. The parking editorial commented upon a request by the SCSC Board of Trustees to the Pueblo City Council asking that the latter authorize SCSC security police to write city parking tickets. Plaintiff called this a "flagrant attempt" to harass students and took issue with the wisdom of placing SCSC parking problems in the hands of a municipal judge: "The judge of Municipal Court is not capable of comprehending the magnitude of the parking problem at SCSC," she wrote. "It's like asking a small-town farmer to solve the transportation problem in New York City—he simply isn't acquainted with the facts." Defendant McAvoy took issue with these statements, again on grounds of libel and ethics, and plaintiff Trujillo and the editor-in-chief of the *Arrow* agreed to revise the editorial. However, in the meantime, Mr. McAvoy suspended the managing editor and the parking editorial was subsequently printed as revised by Mr. McAvoy. The proposed column never appeared in the *Arrow*. Mr. McAvoy testified that he held up publication pending an investigation of certain statements of fact, and, after Miss Trujillo had been suspended, publication was dropped.

The suspension of plaintiff Trujillo caused a considerable stir on the campus. The editor-in-chief, Miss Teddy Incerto, resigned to show support for Miss Trujillo. The Associated Student Government provided funds to finance a single issue of the *Broadside*, a newspaper edited by Miss Incerto and Miss Trujillo. The *Broadside* published the cartoon of Dr. Hopper and the caption, without, however, the president's name attached. The issue also contained the column and parking editorial, without reference to "the" municipal judge as a "small-town farmer." In addition, the Associated Student Government voted to stop any transfer of student activity fees to the *Arrow*. However, the business manager "overruled" the students on the ground that it would be illegal to hold up transfer of funds. In November, 1970, the College Senate, composed

predominantly of faculty members, promulgated a publications policy to guide the faculty adviser in his relations with the *Arrow* staff.

The most important testimony at the hearing concerned the understanding of those involved in the disagreements as to the function of the *Arrow*. Plaintiff Trujillo testified that prior to July, 1970, the newspaper had been a student enterprise. Miss Incerto, former editor-in-chief, confirmed this view, and, indeed, no evidence was offered which showed that either "direct" or "indirect" control was exerted over student writing prior to the events which are the subject of this lawsuit. Plaintiff also testified that she was informed of the policy change only after the Welcome Week incident. Her understanding of the change was that the *Arrow* staff had a duty to submit to defendant McAvoy any writing which the students judged to be "controversial." She stated that she did not know what "controversial" meant and she knew of no standards which the faculty intended to use in judging the acceptability of student work. The administration's new policy was not discussed in any of her summer journalism classes, Miss Trujillo said, nor were the canons of ethics ever thoroughly discussed or related to the work of the *Arrow* staff.

Mr. McAvoy testified that, when he was appointed faculty adviser to the *Arrow* in the summer of 1970, he was told to use his professional experience and the canons of ethics in judging student work. The idea of the policy change, he said, was to prepare students for a career in journalism. He confirmed that the *Arrow* staff was instructed to submit only "controversial" material and that he had made no effort to define "controversial." He denied that the policy was one of censorship or that student rights of free speech had been diminished. All of the changes proposed or made were changes in form, not substance, he stated. When asked why he had not informed Miss Trujillo of the policy change before the publication of the Welcome Week edition, Mr. McAvoy replied that Miss Incerto had been informed and he had assumed she would explain the matter to her staff. Mr. McAvoy also testified that he suspended Miss Trujillo because she seemed unwilling to learn and he "couldn't do any more for her."

Miss Incerto confirmed that she had not explained the policy change to her staff and that she too had been confused about the policy and her responsibility. The president of the student body testified that he was not told of any policy change during discussions about finances but he understood that some change might take place in the future.

We do not doubt the good faith of any of the parties who testified at the hearing. Little of the evidence was contradictory. What the testimony rather emphatically revealed is that the SCSC administration and faculty, on one hand, and students, on the other, have been living in separate worlds. Because they control *Arrow* financing, the former have assumed that they are free to change the function of the newspaper. They believe that a change has been carried out. Defendant McAvoy clearly regarded it as his duty to superintend production of the *Arrow* and he viewed plaintiff Trujillo's opposition as evidence that she was unwilling to learn. Plaintiff Trujillo assumed, at least prior to the fall of 1970, that she was free, within the limits of protected speech, to write as she pleased. In September she learned of a change in policy but did not know what to make of it and apparently disapproved.

We begin by noting what we are not required to decide. The question presented is not whether Southern Colorado State College may prohibit entirely the independent expression of student opinion on campus. *Cf.* Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21

# 1270

L.Ed.2d 731 (1969). The college made no effort to squelch the student-financed *Broadside* and we trust that plaintiff has been and still is free to take to the soapbox or handpress to express her views. In addition, we find it unnecessary to decide whether a state-supported college is free to establish a newspaper which it places under the control of its journalism department, whether such a college may decline to finance a newspaper for the expression of student opinion or whether, once established, such a project may be abandoned. We need not decide these questions because we have concluded from the evidence that prior to the summer of 1970 the *Arrow* did serve as a forum for student expression and the new policy of administration and faculty was not thereafter put into effect with sufficient clarity and consistency to alter the function of the newspaper. As a result, we find, the *Arrow* continued to serve as a student forum, the restraints placed on plaintiff's writing did abridge her right of free expression, and her suspension was an impermissible punishment for the exercise of that right.

The faculty adviser's testimony by itself indicates the depth of inconsistency and confusion about the function of the *Arrow*. The idea of the policy change, Mr. McAvoy testified, was to prepare students through supervised *Arrow* work for a career in journalism. Yet student writing was not supervised. No advice or help was extended to the *Arrow* staff either directly or in journalism classes. No standards were promulgated until after the Welcome Week edition had been unilaterally altered and even then staff members were only put on warning that they must secure approval for "controversial" material. Coming as it did upon the heels of a censorship, this instruction no doubt suggested that the faculty adviser would take a serious interest in student work, yet the *Arrow* editors were told that they themselves should judge what is "controversial." We find it anomalous to urge, on one hand, that the *Arrow* was to serve as an instructional tool, and also maintain, in effect, that students were to decide what education they ought to receive. Perhaps defendant McAvoy himself saw no inconsistency between the *Arrow* as a teaching device and as a forum for student expression. He testified that the *Arrow* had always been such a forum and that plaintiff Trujillo's writings had not been censored. By this he meant that she was permitted to write upon subjects she had chosen and he regarded his own suggestions as going to "form" rather than "content." To recommend that an editorial written in a prose line be rendered in iambic pentameter *may* be a suggestion concerning form, but the deletion of a cartoon and caption and the recommendation that a reference to a judge as a small-town farmer be dropped obviously concern content. The right of free expression would have little meaning if otherwise protected speech could be so altered.

The state is not necessarily the unfettered master of all it creates. Having established a particular forum for expression, officials may not then place limitations upon the use of that forum which interfere with protected speech and are not unjustified by an overriding state interest. Antonelli v. Hammond, 308 F.Supp. 1329 (D.Mass. 1970); Zucker v. Panitz, 299 F.Supp. 102 (S.D.N.Y.1969); Dickey v. Alabama State Board of Education, 273 F.Supp. 613 (M.D.Ala.1967); Wirta v. Alameda-Contra Costa Transit District, 68 Cal.2d 51, 64 Cal.Rptr. 430, 434 P.2d 982 (1967). In the context of an educational institution, a prohibition on protected speech, to be valid, must be "necessary to avoid material and substantial interference with schoolwork or discipline." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 511, 89 S.Ct. 733, 21 L.Ed.2d 731, 739 (1969). No such justification has been offered here. While Mr. McAvoy did suggest that he was concerned about libel, defendants made no effort to prove

that plaintiff Trujillo's writings were libelous as a matter of Colorado law and also unentitled to first amendment protection as a matter of federal law. *Cf.* New York Times Co. v. Sullivan, 376 U. S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

■ We appreciate that school officials have authority "to prescribe and control conduct in the schools," but this authority must be exercised so as not to intrude upon "fundamental constitutional rights." Tinker v. Des Moines Independent Community School District, *supra*, 393 U.S. at 507, 89 S.Ct. at 737. The faculty adviser's conduct had the effect of reining in on the writings of plaintiff Trujillo while leaving the work of other *Arrow* writers unexpurgated. As the testimony of everyone made clear, the rubric "controversial" was ill-suited to justify this difference in treatment. Nor can we uphold such conduct merely because it comes labeled as "teaching," when in fact little or no teaching took place. The administration and faculty may have had the best of intentions concerning the *Arrow's* future, but it is clear to us that they did not carry out their plans.

Had the *Arrow* not served as a student newspaper prior to the summer of 1970, the questions posed by this litigation might never have arisen. This decision only requires that school officials make a clear choice. That much, we think, will be salutary both for faculty and students. Experience shows, and the *Broadside* is but an example, that when one forum for the free expression of beliefs is shut off, students will find another.

The foregoing constitutes the required findings of fact and conclusions of law.

It is therefore

Ordered that defendants reinstate plaintiff, with back pay, to her position as managing editor of the Southern Colorado State College *Arrow*.