Breitel, J.
These are consolidated proceedings under CPLB article 78 to compel the officials of two tax-supported public colleges to suppress publication in student newspapers of articles grossly offensive to religion. The articles attack particular organized religions in terms derogatory, profane, and blasphemous. In one of the articles, the vocabulary of common obscenity is used, although no party tenders any issue of obscenity. The newspapers are financed out of college funds and mandatory student fees.
The issue is whether student papers underwritten by the schools, open to the expression of diverse opinions, which, at least on two occasions, have crossed over into the area of religion, may be prohibited from so doing on the ground that govern? ment’s neutrality on religious issues is thereby violated.
Special Term had directed the college officials to regulate the content of the newspapers insofar as religious materials were concerned. The Appellate Division reversed.
The order of the Appellate Division should be affirmed. Tax-supported colleges may provide financial assistance for a student newspaper publishing an occasional article attacking religious beliefs, so long as the nature of the attack is arguably within constitutionally protected publication. The colleges merely provided a neutral forum for debate, and did not evidence an intent to advance or destroy religious beliefs. Only if the colleges continued financial support to a newspaper systematically attacking religion over a period of time, without balance, might there be an attempt to “ establish ” a “ secular religion ”. *113 Absent such a showing, censorship by college officials of occasional articles touching on religious beliefs would violate freedom of the press.
Petitioners in the Panarella proceeding are a student at Staten Island Community College and his father. In the Mahoney proceeding, petitioners are four taxpaying students at Richmond College. Both colleges are components of the City University of Few York. Both are fínancéd in part by State and local funds, and are under the control of the Board of Higher Education of the City of New York
The students at Staten Island Community College publish a student newspaper called The Dolphin. Sometime before April 16, 1969, an article appeared in the newspaper entitled, ‘ * The Catholic Church—Cancer of Society ”. The article by a purportedly former Catholic is a vulgar and not too literate diatribe against the Catholic Church. The Church hierarchy is described as the “ holy Mafia ”; the saints as “ neurotic masochists and Catholic schools are termed ‘ ‘ institutions of lunacy ’ ’. The tone is unrelentingly disputatious and insulting.
Nine letters to the editor of the student publication appeared in response to this article. Eight took issue with the article’s criticism of the Church, some insisting that the author was abusing the freedom of speech. One letter commented favorably on the article.
The student newspaper at Richmond College is The Richmond Times. During 1969, the newspaper printed an article entitled “From the Hart ”, eyidently expressing a Black militant attitude toward Christianity. At best it may be described as a sexual allegory of the reaction of prejudiced whites against Jesus Christ reborn of a black mother. Its tone is ‘ ‘ shockingly vile and offensive ”. The imagery borders on the obscene, and the language, as noted, is drawn from the vocabulary of obscenity.
The student newsapers are funded by mandatory student fees collected at the beginning of each semester. The Richmond Times displays the official seal of the City University of New York, and The Dolphin displays the seal of the Community College. The staffs of the publications are severally provided with an office on campus and a college telephone. Faculty mem *114 bers serve as advisors. Students are invited in student handbooks to participate in publishing the newspapers.
The petitioning students and taxpayers contend that permitting the publication of articles attacking religion in newspapers supported by public funds and identified with public institutions violates the establishment clause of the First Amend-' ment. They contend that college newspapers, sponsored by public institutions, may not publish articles hostile to religion and disparaging to sacred religious beliefs. They argue that the freedom of expression has no relevance where the effect of the articles is to establish a ‘ ‘ secular religion ”. Petitioners request that the colleges adopt and enforce regulations prohibiting derogatory references to religion.
Special Term found for the petitioners and directed the college officials to prevent publication of similar articles in the future. The court held there was a violation of the establishment clause, reasoning that ‘ ‘ a government that underwrites attacks on religion is no longer neutral.” The Appellate Division reversed and dismissed the petitions holding that the colleges had merely established a forum for the free expression of ideas, and that dnce having established such a forum, college officials may not “place limitations upon its use which infringe upon the rights of the students to free expression ”. Mr. Justice Mtjnder, dissenting in the Richmond College case, found The Richmond Times article so offensive that it should be suppressed to prevent the State from subverting religion and to enforce decorum on the campus.
The establishment clause of the First Amendment has been interpreted to prevent the government from becoming an active participant in religious affairs. Thus, the Supreme Court has held invalid a system of release time for religious instruction conducted on public school premises (McCollum v. Board of Educ., 333 U. S. 203), a program of prayers and Bible-reading in the public schools (Abington School Dist. v. Schempp, 374 U. S. 203; Engel v. Vitale, 370 U. S. 421), and programs of public school instruction favoring a religious view of life (Epperson v. Arkansas, 393 U. S. 97). On the other hand, the Supreme Court has sustained government programs and laws having secular objectives, despite incidental benefit or hindrance to religion. Thus, States have been permitted to enforce Sunday *115 closing laws (McGowan v. Maryland, 366 U. S. 420), to reimburse parents for the cost of transporting their children to parochial schools (Everson v. Board of Educ., 330 U. S. 1), and to provide textbooks for students in these schools (Board of Educ. v. Allen, 392 U. S. 236). (See, generally, P. G. Kauper, The Walz Decision: More on the Religion Clauses of the First Amendment, 69 Mich. L. Rev. 179, 180-181.)
The Schempp case (374 U. S. 203, supra), involving prayers in public schools, provides a general standard for determining if government action violates the establishment clause: ‘ ‘ The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.” (374 U. S., at p. 222.) Similarly, in the Epperson case (393 U. S. 97, supra), where the court struck down an Arkansas statute making it unlawful for a teacher in a State-supported school to teach a theory of biological evolution, the court stated that government ‘1 may not be hostile to any religion or to the advocacy of no-religion ; and it may not aid,, foster, or promote one religion or religious theory against another or even against the militant, opposite ” (393 U. S., at p. 104).
In the recent case of Walz v. Tax Comm. (397 U. S. 664), the court sustained property tax exemptions to religious organizations for properties used solely for religious worship. Chief Justice Burger’s opinion for a 7-1 majority states that for those who wrote the religion clause of the First Amendment the “ establishment” of religion connoted “ sponsorship, financial support, and active involvement of the sovereign in religious activity ” (397 U. S., at p. 668). As a definition, this language suggests a more restrictive view of establishment than some of the court’s earlier utterances (id., see Kauper, op. cit., supra, 69 Mich. L. Rev., at p. 197; Comment, The Supreme Court, 1969 Term, 84 Harv. L. Rev. 32, 129). As Chief Justice Burger elaborated: “ The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no *116 religion be sponsored or favored, none commanded, and none inhibited. The general principle dedncible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference. ” (397 U. S., at p. 669.)
In the instant case, there is no showing that college officials originally intended or now intend to promote or inhibit religion by sponsoring the student newspapers. Indeed, the secular objectives furthered by the provision for these newspapers are sever#! and obvious. Students who work on newspapers develop skills in journalism and management. The newspaper provides the campus community with the news and with a calendar of events. College officials, campus organizations, students, and alumni may communicate with other groups. The newspaper provides an opportunity for the exchange of intellectual ideas, not ■ necessarily good ones. It serves as a neutral forum for debate of .social and local issues of campus concern. A neutral forum by definition provides place or space for contention on controversial issues. If religious issues fall within that purview they may not be excluded as unmentionable, so long as the provider of the forum maintains its strict neutrality. In short, the purpose of sponsorship of student newspaper is neither advancement nor inhibition of religion, if there is in truth a neutral forum.
There is no showing that the articles attacking religion were systematic or continuing, or that articles and letters presenting counterattacks were excluded. The record indicates that two articles were published, one in each paper, and one of these was answered by letters to the editor. That the debate may at times be illiterate, distasteful, insulting, and even shocking, indeed by intention, does not change the original purpose of the college support. The grant of financial aid benefited the attacked as well as the attackers. Use of State moneys to support the newspapers does no more to establish a religion or inhibit it, than use of State moneys to build auditoriums, to provide police protection for speakers, or to subsidize distribution of literature, *117 including religious proselyting, through the mails. The action of college officials may not be interpreted as an attempt to establish a “ secular religion they simply have not spared religion, any more than love of country, from the attack of individuals expressing their own contentions.
Granting financial means to a newspaper occasionally publishing articles promoting or condemning religion may give rise to some, but yet a lesser, involvement than censoring articles having a religious subject, or terminating financial aid when religious attacks are published. The questions are ‘ ‘ whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement- ” (Walz v. Tax Comm., 397 U. S. 667, 675, supra). Control of the content of the newspaper would entail sustained and detailed review of religious material submitted for publication. The hazards that articles indirectly favorable to established religions may be allowed while hostile articles are suppressed, or the other way around, are hardly less under a system of review by college officials, than the hazards that articles of one persuasion or another may appear with undue frequency in an unfettered, subsidized press.
Indeed, on reflection it should be evident that exclusion of all religious material from a student newspaper, however balanced or neutrally supervised, could defeat a significant number of acceptable civilized purposes. Would such neutrality prohibit the listing of church and religious events, or even extended advertising of such events ? Would it prohibit the publication of serious, well-written descriptions of religious practices and customs? Would indeed neutrality in religion prohibit the study — the critical study—of comparative religion and religious history? Or, even more troublesome, the study of religious controversy as a part of a course in secular history? It would be difficult, in the interest of preserving religion from attack to avoid excluding every passing reference to religion or religious event. Thus, the test is not the appearance of derogatory or critical material, but whether government, and government schools, maintain neutrality in the sense of permitting all sides of any religious controversy to be raised and never permit one side or another to be favored directly or indirectly. This is not to say that the problem for the schools and, *118 therefore, for the courts is not a subtle one, and one that will not arise again to require decisions even more difficult than this one. This must be so if only because there is aJ collision here between two primary constitutional principles, contained indeed in the same First Amendment of the Federal Constiution (cf. N. Y. Const., art. I, §§ 3, 8). It would be a sad day when only in private colleges legitimate controversies engendered by religion could be the subject of study and discussion.
There remains only the suggestion by the dissenter at the Appellate Division that The Richmond Times article, described by him as “ a vile, vulgar and lewd attack upon Christianity ’ ’, should be suppressed to maintain an efficient school system. It suffices to say that neither petitioners nor college officials have urged that either of the articles be suppressed on this ground. Indeed, unless it can be shown that suppression is necessary to avoid material and substantial interference with the requirements bf order and discipline in the operation of the college, publication js protected by freedom of the press (Trujillo v. Love, 322 F. Supp. 1266, 1270-1271 [D. Col.]; Antonelli v. Hammond, 308 F. Supp. 1329, 1336-1337 [D. Mass.]; Dickey v. Alabama State Bd. of Educ., 273 F. Supp. 613, 617-618 [M.D. Ala.]; cf. Tinker v. Des Moines School Dist., 393 U. S. 503, 511; Burnside v. Byars, 363 F. 2d 744, 748-749 [5th Cir.]).
Nor is any issue presented that tlie schools have incompetently permitted newspapers of such poor quality and content to h@ purveyed that they are subject to administrative correction for that reason. Obviously, such an issue would not be -available in a judicial proceeding of this kind.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Chief Judge Fuld and Judges Jasen, Gabrielli, Jones and Wachtlee concur with Judge Beeitijil ; Judge Burke dissents in part and votes to affirm as to Staten Island Community College and to reverse as to Richmond College on the dissenting opinion at the Appellate División.
Order affirmed.