OPINION OF THE COURT
Jerome F. Hanifin, J.
In November of 1977, claimants were students at the State University of New York at Binghamton (University), an educational institution owned, operated and funded by the State of New York.[1] Approximately one week prior to November 11, 1977, someone emptied the contents of a carbon dioxide fire extinguisher on the walls of one of the *1093 floors in Oneida Hall, a student residential dormitory at the University. The statement, “This floor is gay,” was spelled out on the walls with extinguisher discharge and the wall was signed “Seneca Strike Force,” also with extinguisher discharge. A number of the residents of the victimized floor were upset about the incident and gathered in the room of one of the students, William I. Kaplan, to discuss what might be done. Mr. Kaplan believed that he had heard the claimants refer to themselves as the Seneca Strike Force, and thus concluded that the claimants were responsible for the fire extinguisher incident. After some discussion, Mr. Kaplan hit upon what he regarded as a “funny” response. He wrote a letter and signed both claimants’ names thereto. After the letter was composed, there was some additional discussion in Mr. Kaplan’s room about whether it would be “funny” if the letter appeared in the student newspaper, the Pipe Dream. Somehow it found its way to the newspaper and appeared in the November 11, 1977 issue in the “Letters” section under the title “Mental Morons”. The letter reads as follows:
“To the Editor:
“Last week some idiots wrote on a male floor’s walls with a fire extinguisher ‘This floor is gay.’ The actions of these mental morons is disgusting both for their destructiveness and for their narrow-minded bigotry.
“The abuse of the term ‘gay’ as a pejorative term seems closely allied to intellectual imcompetence [sic]. Clearly, bigotry against gays goes deep into the social structure of stupidity. The most intolerant always seem to be the least informed and least informed always seem to be biased.
“As members of the gay community we hope that the evident stupidity of these people will speak for the gay cause. Instead of spreading the word of prejudice, they have indeed caused a reaction against their cause. Any sensible person recognizes the folly of this insidious propaganda.
“It is only the childish actions of people that speak against their cause. The paranoia of stupidity is all the *1094 worse because its fear of ^struction at the hands of intelligence is reasonable. Let us hope for intelligence.
Selmar Bringsjord
Gary Mazart”
Claimants seek damages from the State, arguing that the published letter was false, defamatory and libelous per se.[2]
Pipe Dream was the student newspaper at the University. Its operation was supported by funds allocated to it by the student association (the source of which was a student-mandated activities fee collected from all students who matriculated at the University) and from revenues received from advertisers. Although the newspaper’s budget (as fixed by the student association) and its expenditures were reviewed by the University administration, no other control was exercised over the newspaper. There was no faculty advisor, and no one, other than the students who actually prepared and published the newspaper, reviewed the contents thereof prior to publication. There were no policies or guidelines promulgated by the University in connection with the publication and distribution of the newspaper. Pipe Dream was free and was distributed campus-wide at certain drop-off points. Although its circulation was generally limited to the University campus, there was a small mailing list of subscribers, and it appears that advertisers in the local community also received copies. The University furnished office space, desks, and janitorial services to the newspaper at no cost. The newspaper staff and employees (all students) were selected by the existing staff of the newspaper; thus control of the newspaper by the students was self-perpetuating. Students could take a course (English 199) in which working on the newspaper was considered an “independent study”, which could lead to the receipt of college credit.
*1095 None of the members of the November, 1977 editorial staff of the Pipe Dream were produced as witnesses at the trial. One witness, Patrick J. Burke, who was subpoenaed by the claimants, testified that he was employed by the Pipe Dream in November of 1977. His job, for which he was paid $2 per hour by the newspaper, was to “paste-up copy”. In other words, it was his job to cut the various articles that would appear in the Pipe Dream in such a way that they would fit the format of the newspaper. Mr. Burke knew Bringsjord because he had roomed with him for approximately three weeks when they were both freshmen. He also knew claimant Mazart, mostly because he was a friend of Bringsjord. Mr. Burke testified that he noticed the letter prior to the time it was pasted up because he was familiar with the two individuals whose names appeared at the end thereof. He did not specifically recall reading the letter, but he believed he probably did read it because he knew the apparent authors. Someone other than Mr. Burke pasted up the letter. Mr. Burke further testified that he had nothing to do with the editorial policy of the newspaper, made no decision with regard to what should or should not be published and did not discuss the letter with any of the members of the editorial staff of the newspaper prior to its publication. He professed ignorance of the editorial policy of the newspaper with regard to review of letters to the editor. He also testified that the editor-in-chief of the newspaper at the time the letter was published told him that he had no idea claimants were not the authors. In fact, no one checked with the claimants to verify authorship.
Barry Grodenchik, the editor of the Pipe Dream in November of 1980, testified that he reviewed each letter to the editor “to see if it contains anything that’s extraordinary out of the way kind of stuff. Sometimes I seek verification of the letter. And sometimes, depending on time limits, and other things, I don’t.” He estimated that he actually verified approximately 50% of the letters published, either by calling the individuals who purportedly wrote the letters, or by discussing letters with them face to face. Having been asked upon cross-examination if he examined the files of past editors-in-chief and after having *1096 responded “on occasion”, Mr. Grodenchik was then asked: “Did any of the past editors ever mention checking letters for certification?”[3] He answered: “I have seen nothing in the records, nothing at all.”
After being informed that the claimants were not the authors of the letter which appeared in the November 11, 1977 issue of the Pipe Dream, the editors printed a retraction and apology in the November 18, 1977 issue.
In their briefs, able counsel for both parties dealt at some length with the issue of whether the letter was defamatory. Although, in the court’s opinion, resolution of this issue is unnecessary in the context of this claim, a brief discussion appears appropriate. “A writing is defamatory — that is, actionable without allegation or proof of special damage — if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community, even though it may impute no moral turpitude to him.” (Mencher v Chesley, 297 NY 94, 100.)
Did the letter in the Pipe Dream expose claimants to hatred, contempt or aversion, or induce an evil or unsavory opinion of them in the minds of a substantial number of the community? The answer to the question is far from simple. In general, the community we are concerned with here was the University community located on a campus outside of the City of Binghamton, Broome County, New York. According to the chairman of the English department at the University, homosexuals were able to function in the University community with less of a problem than say Anita Bryant might have. This witness was of the view that sexual orientation had no more bearing in the classroom than religious affiliation. The assistant vice-president for finance, management and control at the University opined that the published letter had a “[v]ery low, very little affect [sic]” on the campus community.
No doubt the impact of the published letter on the collective mind of the University was considerably less than it might have been had the letter been published in a *1097 conservative rural American village. Nonetheless, the court finds that an unsavory opinion of the claimants did settle in the minds of a substantial number of persons in the University community. The very fact that the fire extinguisher incident precipitated the letter shows that the question of homosexuality was a significant one on the University campus. It does not appear that students were sneaking about the campus at night spraying “This floor is straight” or “This floor is heterosexual” on the walls of residential dormitories. Of course such an act, in the context of libel, would be meaningless. Spraying “This floor is gay,” on the other hand, had a very real significance. It caused an adverse reaction on the victimized floor and precipitated the letter, which apparently gained considerable support at the meeting following the fire extinguisher incident. Both claimants testified that they were accosted by numerous fellow students after the event and queried about their sexual orientation, and the court finds their testimony, in this respect, credible. Deviant sexual intercourse and sodomy were crimes in the State of New York at the time the letter was published (Penal Law, §§ 130.00 and 130.38). Certainly those members of the University community who did not personally know the claimaints would logically conclude that claimants were homosexual since the letter identified them as being members of the “gay community.” The court finds that a substantial number of the University community would naturally assume that the claimants engaged in homosexual acts from such identification (cf. Nowark v Maguire, 22 AD2d 901). The fact that homosexual acts between consenting adults may no longer be a crime in New York State (People v Onofre, 51 NY2d 476) does not lessen the impact of the publication of the letter in November of 1977. The court, therefore, finds that the claimants were libeled per se (cf. Nowark v Maguire, supra).
The State argues, however, that since the letter dealt with a matter “arguably within the sphere of legitimate public concern” (Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199), the publication thereof was qualifiedly privileged and that the claimants are not entitled to a recovery of damages since they failed to establish by a *1098 preponderence of the evidence that the newspaper acted “in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination” (p 199).
Certainly the subject matter of the letter, prejudice against homosexuals, dealt with a matter of public concern. It is just as certain, in the court’s opinion, that the editors of the Pipe Dream acted in a grossly irresponsible manner by failing to give due consideration to the standards of information gathering and dissemination. It is obvious that authorship of a letter wherein the purported author appears to be libeled should be verified. Not only was the authorship of the letter herein not verified, but it appears that the Pipe Dream, at least in November of 1977, had no procedures or guidelines with regard to the verification of the authorship of any letters to the editor. Although claimant’s proof on this latter point might have been stronger, the court considers it sufficient. As previously noted, the editor-in-chief of the newspaper in November of 1977 stated to Mr. Burke that he had no idea that claimants were not the authors of the letter (note he did not state that the newspaper editors failed to follow their normal verification procedure), and the editor-in-chief of the newspaper at the time of trial testified that he found no indication, upon examining the files of past editors, that verification of the authorship of letters to the editor was a standard procedure. Under the circumstances, it is clear that the publication of the letter was not qualifiedly privileged.
Having concluded that the claimants have been libeled and that the libel was not qualifiedly privileged, it does not necessarily follow that the State of New York must respond in damages. There are two possible theories of liability: (1) the State, through the University, may be vicariously liable for the torts of the Pipe Dream and its editors on the theory of respondeat superior (i.e. the University, as principal, might be liable for the torts of its agents, the student paper and editors), and (2) the State, through the University, may have been negligent in failing to provide guidelines to the Pipe Dream staff regarding libel generally, and specifically, regarding the need to review and verify letters to the editor.
*1099 In regard to the first theory, the State could be held vicariously liable if the University and the Pipe Dream staff operated in some form of agency relationship. However, it is characteristic of the relationship of principal and agent that the principal has a right to control the conduct of the agent with respect to matters entrusted to him (2 NY Jur 2d, Agency, § 2). While this control need not apply to every detail of an agent’s conduct and can be found where there is merely a right held by the principal to make management and policy decisions affecting the agent (cf. Bing v Thunig, 2 NY2d 656), there can be no agency relationship where the alleged principal has no right of control over the alleged agent (Krom v Sharp & Dohme, 7 AD2d 761, mot for rearg den 14 AD2d 458; 2 NY Jur 2d, Agency, §2).
There are severe constitutional limitations on the exercise of any form of control by a State university over a student newspaper, which infringes on the rights of the students to free expression (Matter of Panarella v Birenbaum, 37 AD2d 987, affd 32 NY2d 108). By terms of both the First and Fourteenth Amendments, freedom of speech and press are protected against interference from State action, and such protection applies with no less force on the campuses of State universities than in the communities at large (Healy v James, 408 US 169). Therefore, censorship or prior restraint of constitutionally protected expression in student publications at State-supported institutions has been uniformly proscribed by the courts. Such censorship or prior restraint cannot be imposed by suspending editors (Scoville v Board of Educ., 425 F2d 10, cert den 400 US 826), by suppressing circulation (Channing Club v Board of Regents of Texas Tech Univ., 317 F Supp 688), by requiring prior approval of controversial articles (Quarterman v Byrd, 453 F2d 54; Trujillo v Love, 322 F Supp 1266; Antonelli v Hammond, 308 F Supp 1329), by excising or suppressing distasteful material (Trujillo v Love, supra; Korn v Elkins, 317 F Supp 138; Zucker v Panitz, 299 F Supp 102), or by withdrawing financial support (Joyner v Whiting, 477 F2d 456; Antonelli v Hammond, supra).
Claimants’ counsel argues that “[t]he issue of prior restraint has never been extended to libel * * * cases” *1100 (citing Thomas v Board of Educ., 607 F2d 1043). However, the Thomas decision does not deal directly with prior restraint of libel, but merely includes libel as one of the “categories of words that the state may punish” (pp 1047-1048). In fact, in the absence of special circumstances, the publication of libelous material will not be restrained by the courts.
“A court of equity will not, except in special circumstances, issue an injunctive order restraining libel or slander or otherwise restricting free speech.
“To enjoin any publication, no matter how libelous, would be repugnant to the First Amendment to the Constitution, Crosby v. Bradstreet Co., 312 F.2d 483 (2d Cir. 1963); Parker v. Columbia Broadcasting System, Inc., 320 F.2d 937 (2d Cir. 1963); cf. Near v. State of Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), and to historic principles of equity. American Malting Co. v. Keitel, 209 F. 351 (C.C.A. 2, 1913).” (Konigsberg v Time, Inc., 288 F Supp 989.)
Thus, it appears that a policy of prior approval of items to be published in a student newspaper, even if directed only to restraining the publication of potentially libelous material (cf. Trujillo v Love, supra), would run afoul of Near v Minnesota (supra, p 716) wherein the court stated that “liberty of the press, historically considered and taken up by the Federal Constitution, has meant, principally although not exclusively, immunity from previous restraints or censorship”.
Concededly, the freedom of the press enjoyed by students is not absolute or unfettered. “Students, like all other citizens, are forbidden advocacy which ‘is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.’ See Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). Tinker v. Des Moines Ind. Community School Dist., 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969), expressly limits the free and unrestricted expression of opinion in schools to instances where it does not ‘materially and substantially interfere with the requirements of appropriate discipline in the operation of the *1101 school.’” (Joyner v Whiting, supra, p 461.) But these considerations are hardly relevant in the instant claim. The court, therefore, finds that the University was powerless to prevent the publication of the letter.
Although claimants’ counsel suggests in his argument that the University’s involvement with the funding of the Pipe Dream might afford it some measure of control, this involvement affords little, if any, actual control over the funding and expenditures of the newspaper (see 8 NYCRR 302.14), and in any event, it is settled that no form of editorial control over constitutionally protected expression in student publications can be based on the University’s power of the purse (Joyner v Whiting, supra; Korn v Elkins, supra; Antonelli v Hammond, supra; Matter of Panarella v Birenbaum, supra).
No doubt the University benefits, and did benefit at the time of the publication of the letter, from the existence of the Pipe Dream. That the University recognized participation on the newspaper as a form of independent study indicates that it received educational benefits. Furthermore, the Pipe Dream served as a means of disseminating information to the University community and as a forum for debate and discussion for members of the University community. However, these factors, which might suggest an agency relationship, are insufficient to overcome the University’s lack of control over the newspaper.
The fact that the University created a climate wherein the student newspaper flourished by furnishing office space and janitorial services hardly creates an agency relationship which would permit recovery against the State. Such accoutrements are nothing more than a form of financial aid to the newspaper which cannot be traded off in return for editorial control (see Joyner v Whiting, supra; Antonelli v Hammond, supra).
The court recognizes that the Pipe Dream and its staff may be incapable of compensating claimants for any damages flowing from the libel. But, in light of the University’s eschewing control, editorial or otherwise, over the paper and the constitutionally imposed barriers to the exercise by the University of any editorial control over the news *1102 paper, the court must reluctantly conclude that the relationship of the University and the Pipe Dream is not such as would warrant the imposition of vicarious liability on the State for defamatory material appearing in the student newspaper (see Note, Tort Liability of a University for Libelous Material in Student Publications, 71 Mich L Rev 1061).
The second theory of liability herein involves the question of whether the State University, and therefore the State, can be cast in damages in simple negligence for failing to provide to the student editors guidelines and procedures designed to avoid the publication of libelous material. As discussed above, there are constitutional limitations on the actual exercise of editorial control by the University, but this does not necessarily preclude the existence of a duty on the part of the University to furnish guidance.
In view of the absolute hands-off policy adopted by the University administration, it is clear that no such guidelines were furnished, and from the evidence adduced at trial, it does not appear that student editors verified the authorship of controversial letters to the editor prior to the subject publication. The issue then is whether there was a duty on the part of the University administration. The court concludes that there was not. It is clear from a reading of the published cases dealing with the rights of college students that the courts uniformly regard them as young adults and not children. “The university setting of college-age students being exposed to a wide range of intellectual experience creates a relatively mature marketplace for the interchange of ideas so that the free speech clause of the First Amendment with its underlying assumption that there is positive social value in an open forum seems particularly appropriate” (Antonelli v Hammond, 308 F Supp 1329, 1336, supra; emphasis supplied). Furthermore, the establishment by statute of the minimum voting age (Election Law, § 5-102), drinking age (Alcoholic Beverage Control Law, §65) and the age of consent for marriage (Domestic Relations Law, § 7) at 18 years is indicative of a recognition, at least on the part of *1103 the Legislature, of a substantial degree of maturity in college-aged persons.
In view of this societal recognition of adulthood, can the court conclude that the University had a duty to supply guidelines to the Pipe Dream editors in order to better enable the editors to avoid libeling an innocent party, even though such guidelines are generally considered within the common knowledge of mature lay persons? In rejecting the need for expert affidavits on a motion for summary judgment in a libel action, the court in Greenberg v CBS Inc. (69 AD2d 693, 710) stated: “The elementary standards of basic news reporting are common knowledge. News articles and broadcasts must contain the answers to the essential inquiries of who, what, where, when, why and how.” Certainly the need to verify the authorship of a letter wherein the purported author appears to be libeled is rudimentary. A conclusion that the University had a duty to furnish guidance to the Pipe Dream concerning libel would in effect be a finding that the Pipe Dream editors lacked that degree of maturity and common sense necessary to comprehend the normal procedures for information gathering and dissemination. But surely such a finding would be anomalous since those editors’ contemporaries might well be selected to sit on a jury (Judiciary Law, § 510, subd 2), assigned the task of determining, without the aid and guidance of expert testimony, whether a newspaper (the Pipe Dream or any other) had failed to adhere to generally followed standards, resulting in the publication of libel. Indeed, the applicable standard by which to measure a newspaper’s exercise of responsibility, in a case such as this, is that of the reasonable individual (Karaduman v Newsday, Inc., 71 AD2d 411, 414; Greenberg v CBS Inc., supra, p 710). The court must, therefore, find that the University had no duty to supply news gathering and dissemination guidelines to the Pipe Dream editors since they were presumed to already know those guidelines. Admittedly, it appears that the student editors of the Pipe Dream in 1977 either did not know or simply ignored commonsense verification guidelines with regard to the publication of the instant letter. But that was not the fault of the University. In either event, there was no duty on the *1104 part of the University. The editors’ lack of knowledge of or failure to adhere to standards which are common knowledge (Greenburg v CBS Inc., supra) and ordinarily followed by reasonable persons (cf. Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, supra) was not reasonably foreseeable.
In view of the foregoing, these claims must be and hereby are dismissed.

. These claims were originally brought against the State of New York and the State University of New York at Binghamton. The State University of New York at Binghamton is not a proper party defendant and the court has, sua sponte, deleted the University from the title of both claims.

. A publication is libel per se if it appears, on its face, to adversely affect one’s reputation. In other words, no extrinsic facts are necessary to establish the defamatory nature of the publication, since the defamation is clear from the writing itself.

. The word “certification” appears in the trial transcript, but it obviously should read ‘verification.”