# In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 01-4155

MARGARET HOSTY, JENI PORCHE, and
STEVEN P. BARBA, individually and d/b/a INNOVATOR,

*Plaintiffs-Appellees,*

*v.*

PATRICIA CARTER,

*Defendant-Appellant,*

and

GOVERNORS STATE UNIVERSITY; BOARD OF TRUSTEES
OF GOVERNORS STATE UNIVERSITY; DONALD BELL;
TOMMY DASCENZO; STUART FAGAN; PAUL KEYS;
JANE WELLS; DEBRA CONWAY; PEGGY WOODARD;
FRANCIS BRADLEY; PETER GUNTHER; ED KAMMER,
DOROTHY FERGUSON; JUDY YOUNG; CLAUDE HILL IV;
and PAUL SCHWELLENBACH,

*Defendants.*

———————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 0500—**Suzanne B. Conlon**, *Judge.*

———————————

ARGUED JANUARY 7, 2003—DECIDED APRIL 10, 2003

———————————

Before COFFEY, ROVNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.*  Fifteen years ago, in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), the Supreme Court held that high school administrators have broad powers to censor school-sponsored newspapers if their actions are supported by valid educational purposes. In this case, involving an appeal from an order denying summary judgment on qualified immunity grounds, we are asked to consider whether the principles of *Hazelwood* apply to public college and university students.

The three plaintiffs in this case—Porche, Hosty, and Baron[1]—are (or, when this case began, were) students at Governors State University, a state-run institution in University Park, Illinois. They were appointed by the school's "Student Communications Media Board" (SCMB) to serve as editor-in-chief, managing editor, and staff reporter for its newspaper, the *Innovator*, which is supported by student activity fees. According to the plaintiffs, whose claims we must credit at this stage of the proceedings, they occasionally published articles and letters to the editor that were critical of certain faculty members and the school's administration.

When our three plaintiffs took their positions at the *Innovator* and during all times relevant to this lawsuit, the policy of the SCMB was that the student staff of the *Innovator* "will determine content and format of their respective publications *without censorship or advance approval*." (Emphasis added.) Although the newspaper's faculty adviser often read stories intended for publication at the request of the student editors, the adviser did not make content decisions. Only advice was offered.

---

[1]  The district court and the Illinois attorney general use "Barba." We use "Baron," the name the plaintiffs-appellees use.

In the fall of 2000, Patricia Carter, the university's dean of Student Affairs and Services, twice called Charles Richards, president of Regional Publishing, the company which held the contract for printing the *Innovator*. In those calls, Dean Carter told Richards that a school official must review the *Innovator*'s content before it could be printed. She instructed Richards to call her when he received future issues of the paper.

In a November 14, 2000, memo delivered to the *Innovator* editors, Richards relayed the substance of his conversations with Dean Carter. He said Dean Carter told him his company was not to publish any more issues of the *Innovator* without prior approval by a university official. He noted, however, that his understanding of the law was that prior approval by school officials was not cricket. However, he also observed that he was "no attorney, so that the final decision of the handling of this matter should not be left to me." The student editors understood Richards' comments to mean that his company would not print additional editions of the paper until the issue of Dean Carter's prior approval requirement was settled. A company representative confirmed that it did not want to risk printing the newspaper and then not get paid for the effort.

Sparks were ready to fly. The student editors filed this suit against 17 defendants, listing a litany of grievances in their complaint. Ultimately, all defendants were dismissed (mostly due to Eleventh Amendment problems) from the suit. All, that is, except Dean Carter, who unsuccessfully tried to escape on a claim of qualified immunity. She is here today on a narrow interlocutory appeal from the district court's order denying her request to exit the suit before any further proceedings are required.

The pivotal issue for us is whether Dean Carter was entitled to qualified immunity. Her claim is that the law was not clearly established that her request to review and

approve the *Innovator* prior to printing might violate the student editors' rights under the First Amendment.

Qualified immunity protects government officials performing discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For several decades, courts have consistently held that student media at public colleges and universities are entitled to strong First Amendment protections. These courts have held that school administrators can only censor student media if they show that the speech in question is legally unprotected or if they can demonstrate that some significant and imminent physical disruption of the campus will result from the publication's content. Attempts by school officials, like Dean Carter here, to censor or control constitutionally protected expression in student-edited media have consistently been viewed as suspect under the First Amendment. *See*, *e.g.*, *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) (university officials constitutionally prohibited from denying funding to student religious magazine based on content); *Kincaid v. Gibson*, 236 F.3d 342 (6th Cir. 2001) (en banc) (confiscation of college student yearbook by administrators unhappy with content violates First Amendment). The prohibition on administrative censorship has extended to cases where school officials required mandatory prior review of student media, *Antonelli v. Hammond*, 308 F. Supp. 1329 (D. Mass. 1970); *Mazart v. State*, 441 N.Y.S.2d 600 (N.Y. Ct. Cl. 1981); *Milliner v. Turner*, 436 So. 2d 1300 (La. Ct. App. 1983); *Trujillo v. Love*, 322 F. Supp. 1266 (D. Colo. 1971), and other indirect forms of censorship, when undertaken to affect content. *See*, *e.g.*, *Stanley v. Magrath*, 719 F.2d 279 (8th Cir. 1983) (striking down university's attempt to restructure funding to student newspaper because of controversial issue); *Dickey v. Alabama St. Bd. of Educ.*,

273 F. Supp. 613 (M.D. Ala. 1967), *vacated as moot sub nom. Troy St. Univ. v. Dickey*, 402 F.2d 515 (5th Cir. 1968) (suspension of student newspaper editor for content-related reasons held unconstitutional); *Schiff v. Williams*, 519 F.2d 257 (5th Cir. 1975) (reinstating student editors who had been removed because of administrators' objections to poor grammar, spelling, and syntax).

As one federal court of appeals noted in 1973:

> Censorship of constitutionally protected expression cannot be imposed by suspending the editors, suppressing circulation, requiring imprimatur of controversial articles, excising repugnant material, withdrawing financial support, or asserting any other form of censorial oversight based on the institution's power of the purse.

*Joyner v. Whiting*, 477 F.2d 456, 460 (4th Cir. 1973).

The court of appeals for the Fifth Circuit, sitting *en banc*, expressed similar sentiments in ruling that University of Mississippi officials acted illegally when they prohibited the publication of a school-sponsored student literary magazine because it contained "earthy language":

> The University here is clearly an arm of the state and this single fact will always distinguish it from the purely private publisher as far as censorship rights are concerned. It seems a well-established rule that once a University recognizes a student activity which has elements of free expression, it can act to censor that expression only if it acts consistent with First Amendment constitutional guarantees.

*Bazaar v. Fortune*, 476 F.2d 570, 574 (5th Cir. 1973), *adopted en banc in* 489 F.2d 225 (5th Cir. 1973), *cert. denied*, 416 U.S. 1995 (1974).

Dean Carter's contention that she could not reasonably have known that it was illegal to order the *Innovator*'s printer to halt further publication of the newspaper or to

require prior approval of the newspaper's content defies existing, well-established law. Because her actions, if true, violated clear constitutional rights of which she should have been aware, the district court was correct to decline her request to exit the suit via qualified immunity, if *Hazelwood* has not muddled the landscape to such an extent that the law has become unclear.

In *Hazelwood*, the Supreme Court determined that "the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings and must be applied in light of the special characteristics of the school environment." *Hazelwood*, 484 U.S. at 266 (internal citations and quotation marks omitted). But *Hazelwood*'s rationale for limiting the First Amendment rights of high school journalism students is not a good fit for students at colleges or universities. The differences between a college and a high school are far greater than the obvious differences in curriculum and extracurricular activities. The missions of each are distinct reflecting the unique needs of students of differing ages and maturity levels.

According to U.S. Census Bureau statistics, provided to us in a superb *amicus* brief filed by attorney Richard M. Goehler on behalf of a bevy of student press associations, only 1 percent of those enrolled in American colleges or universities are under the age of 18, and 55 percent are 22 years of age or older. Treating these students like 15-year-old high school students and restricting their First Amendment rights by an unwise extension of *Hazelwood* would be an extreme step for us to take absent more direction from the Supreme Court.

The Supreme Court's restrictive First Amendment standard in *Hazelwood* sprang from its premise that the special circumstances of a secondary school environment permit school authorities to exercise greater control over expression by students than the First Amendment would

otherwise permit. However, the judicial deference the Supreme Court found necessary in the high school setting—and in the factual context of *Hazelwood*—is inappropriate for a university setting. This difference was acknowledged by the Court when it explicitly reserved the question of whether the same level of deference it expressed would be "appropriate with respect to school-sponsored expressive activities at the college and university level." *Hazelwood*, at 273 n.7.

The Supreme Court has recognized that where the "vital" principles of the First Amendment are at stake, "[t]he first danger to liberty lies in granting the State the power to examine publications to determine whether or not they are based on some ultimate idea and, if so, for the State to classify them. The second, and corollary, danger is to speech from the chilling of individual thought and expression." *Rosenberger v. Rectors and Visitors of the Univ. of Va.*, 515 U.S. 819, 835 (1995). These dangers are especially threatening in the university setting, where the creative power of student intellectual life remains "a vital measure of a school's influence and attainment." *Id.* at 836.

While *Hazelwood* teaches that younger students in a high school setting must endure First Amendment restrictions, we see nothing in that case that should be interpreted to change the general view favoring broad First Amendment rights for students at the university level. And so we conclude that Dean Carter does not enjoy qualified immunity in this suit.

Unrelated, at least directly, to the qualified immunity issue are a few minor matters we can quickly dispatch. First, Dean Carter says the plaintiffs should have submitted copies of potential newspaper articles to the district court because the court must know what "speech" falls within the First Amendment. She contends that not doing so is a "complete failure of proof" entitling her to summary judgment. While copies of the articles that might have been published in future issues of the *Innovator*

are not in the record, there is a copy of the October 31, 2000, paper. Dean Carter makes no argument that this issue of the paper lacked constitutional protection, and there is nothing in the record indicating that future copies of the *Innovator* would have differed.

Dean Carter also contends that no constitutional violation occurred because she did not actually restrict publication of the paper. She says that the plaintiffs themselves decided not to send further issues of the *Innovator* to Regional Publishing and that they did not publish an issue in December even after an administrator gave them permission to do so. Affidavits, however, show that Regional Publishing was unlikely to print another copy of the paper after Dean Carter's phone call because of her reference to the university's control of the *Innovator*'s purse strings. Furthermore, interpreting the evidence in the light most favorable to the plaintiffs, there would have been no point in publishing a December issue of the *Innovator* after the staff received permission to do so because students were already out of town on winter break. Dean Carter's call, viewed in the light most favorable to the students, caused both Richards' apprehension in publishing another paper and the delay that made publishing a second one futile.

For these reasons, we AFFIRM the order of the district court denying Dean Carter's summary judgment motion on qualified immunity grounds, and we return the case to that court for further proceedings.

A true Copy:

      Teste:

                                             *Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—4-10-03